VIRGINIA VERMICULITE,
LTD., Plaintiff,

v.

W.R. GRACE & CO.–CONN., and
The Historic Green Springs,
Inc., Defendants.

Virginia Vermiculite, Ltd., Plaintiff,

v.

W.R. Grace & Co.–Conn., Defendant.

M.F. Peers, Jr., Norma Peers, and
Virginia Vermiculite, Ltd.,
Plaintiffs,

v.

W.R. Grace & Co.–Conn., Defendant.

Civil Action Nos. 3:96CV00012,
3:96CV00013, 3:95CV00015.

United States District Court,
W.D. Virginia,
Charlottesville Division.

July 26, 2000.

550

Roger Scott Martin, Martin & Woodard, PLC, Charlottesville, VA, Jane Champion Clarke, David Zev Izakowitz, Woods, Rogers & Hazlegrove, P.L.C., Lewis & Clark, Charlottesville, VA, for Virginia Vermiculite, Ltd.

Thomas Eugene Albro, Patricia D. McGraw, Tremblay & Smith, Charlottesville, VA, Randolph S. Sherman, David S, Copeland, Eric A. Aaronson, Kaye, Scholer, Fierman, Hays & Handler, New York City, for W.R. Grace & Co.–Conn.

Michael Eugene Derdeyn, McGuire, Woods, Battle & Boothe, Charlotesville, VA, Charles H. Montange, Seattle, WA, Sara Lee Gropen, Rae H. Ely & Associates, Louisa, VA, for Historic Green Springs, Inc.

### MEMORANDUM OPINION

MICHAEL, Senior District Judge.

These consolidated actions come before the court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Having thoroughly considered the substantial briefing and evidence provided by the parties, and having heard oral argument from counsel on the motions, and for the reasons hereinafter set forth, the court shall

GRANT the plaintiffs' motion in part, DENY the plaintiffs' motion in part, GRANT the defendants' motions in part, and DENY the defendants' motions in part. As a result of this Memorandum Opinion and Order, the plaintiffs' only claims remaining for trial are: VVL's claim for conspiracy to monopolize pursuant to the Sherman Antitrust Act § 2; VVL's corresponding conspiracy to monopolize claim under the Virginia Antitrust Act; and all of the plaintiffs' non-antitrust state law claims, except for unjust enrichment.

## I.

The plaintiffs filed these antitrust cases for violations of sections one and two of the Sherman Antitrust Act, *see* 15 U.S.C.A. §§ 1, 2 (West 1997 & Supp.2000) (" § 1" and " § 2"), and related laws of the Commonwealth of Virginia. The plaintiffs' claims arise out of a series of land donations from defendant W.R. Grace & Co.-Conn. ("Grace"), to defendant The Historic Green Springs, Inc. ("HGSI"), a Virginia nonprofit organization dedicated to the preservation of land in Louisa County, Virginia. Plaintiff Virginia Vermiculite, Ltd. ("VVL"), Grace's competitor, and plaintiffs Millard F. Peers, Jr. and Norma Peers (collectively, "M.F.Peers"), residents of Louisa County, attack the donations, *inter alia*, as conspiratorial efforts to drive VVL out of business, and to restrain trade and monopolize the industry in which VVL and Grace compete.

The following facts are undisputed, unless otherwise noted. VVL is a Virginia corporation engaged in the business of mining, processing, and selling a mineral known as vermiculite. Vermiculite is a naturally-occurring, mica-like mineral found in the ground. When vermiculite is mined, the ore is taken to a processing plant relatively close to the mining site, and processed to remove moisture, rock, dirt, dust, extraneous material, and small particles of vermiculite that are not merchantable. The result of the mining process is vermiculite concentrate, which is separated by grade according to the size of the flakes. The United States grading system classifies vermiculite into three size ranges: grade 3, grade 4, and grade 5. The plaintiffs generally refer to grade 3 as "mid-size" vermiculite concentrate, grade 4 as "small" vermiculite concentrate, and grade 5 as "ultra-small" vermiculite concentrate. The defendants dispute the plaintiffs' classification system. Most applications for vermiculite require that the concentrate be heated, a process known as "exfoliation" or "expansion." This process causes the vermiculite to expand or pop in much the same way as popcorn pops when heated.

Vermiculite is fireproof, and is used in a variety of horticultural, agricultural, industrial, and construction applications. Some of the applications for expanded vermiculite include the production of lightweight concrete, soil mixes, fertilizers, masonry block insulation, and spray-on fireproofing. Vermiculite concentrate is used to produce fire-rated drywall.

Vermiculite is mined in a limited number of specific locations throughout the world, including China, Brazil, Australia, and Russia, and certain countries in Africa. It is imported primarily from companies doing business in South Africa and China. In the United States, vermiculite has been mined only in Virginia, South Carolina, and Montana, but deposits in Montana previously were found to be contaminated by asbestos fibers. Grace also asserts that vermiculite deposits exist in Colorado, Nevada, North Carolina, Texas, and Wyoming, but VVL claims that these deposits currently are not commercially viable, due in part to their low-quality.

The three largest participants in the world-wide vermiculite industry are the South Africa-based Palabora Mining Company ("Palabora"),[1] Grace, and VVL. Palabora is the largest single producer of ver-

1. HGSI refers to this company as Rio Tinto PLC.

miculite in the world, and currently has twenty-five years' worth of reserves (sometimes referred to as "mining rights") in Africa. Grace and VVL are the second- and third-largest vermiculite producers in the world, respectively, and until recently, the only American competitors in the vermiculite industry.[2] In 1991, South Africa and China sold approximately 41,000 tons of vermiculite in North America, representing 23% of North American vermiculite sales. Since then, these imports increased substantially, to approximately 86,000 tons in 1998. In 1998, South African and Chinese imports represented approximately 33% of all North American vermiculite concentrate sales. The parties dispute the impact these foreign imports have on the domestic market.

VVL owns mining rights, conducts mining operations, and operates vermiculite processing plants in Virginia and South Carolina. VVL's South Carolina division does not process any vermiculite mined in Virginia. In 1991, VVL sold approximately 57,000 tons of vermiculite concentrates in North America. Since then, VVL increased its sales to approximately 80,000 tons in 1998. VVL currently sells approximately 30% of all vermiculite concentrate in North America. At its current production rates, VVL controls enough reserves in Virginia to last until the year 2012. VVL has approximately eight years of additional reserves in South Carolina.

Grace, a Connecticut corporation, currently conducts mining operations only in South Carolina. It previously mined in Montana (but ultimately closed those operations), and never mined in Virginia. However, Grace did control substantial mining rights in Louisa County, Virginia— 74–80% of available mining rights in the county—before its donations to HGSI in 1992.[3] The plaintiffs allege that Grace also controlled approximately 82% of the mining rights in South Carolina, with VVL's South Carolina operation controlling the remaining 18%. (The defendants dispute this.) At least 2,000,000 tons of vermiculite reserves in South Carolina remain unleased by any mining company. Grace sells and uses vermiculite internally, and also sells both vermiculite concentrates and expanded vermiculite to third-parties. In 1991, Grace sold 86,157 tons of vermiculite in North America, representing approximately 47% of all North American vermiculite concentrate sales. By 1998, Grace sold approximately 38% of all vermiculite concentrates in North America.

In the 1960s, Grace began exploring the possibility of purchasing vermiculite reserves in Louisa County. At that time, Grace was mining in Montana and in South Carolina, and believed it would need a "third mill" to replace depleting reserves or to add to existing reserves. To that end, Grace acquired substantial mining rights in Louisa County throughout the 1970s, either by buying properties containing vermiculite, or by leasing land from Louisa County property owners.[4]

2. A new entrant in the industry recently began mining operations in Montana.

3. The defendants dispute the plaintiffs' figures. Taking into account Grace's reserve estimates, the Brandy B property, and properties to which VVL had access or rights (the Dowell and R.E. Sansom properties), but which VVL claims could not be mined due to zoning ordinances and conservation easements, the low-end figure would be 67%.

4. The following summarizes Grace's 1970s Louisa County transactions. July 20, 1972: Grace acquires JONES properties (7 acres); Dec. 27, 1972: Grace purchases two M.F.

PEERS properties (Parcel I: 262.98 acres; Parcel II: 276.42 acres); Aug. 28, 1973: Grace purchases HARRIS properties (5 acres); Nov. 21, 1973: Grace purchases LLOYD I properties (67.175 acres); Dec. 10, 1973: Grace purchases LLOYD II properties (110.33 acres); Dec. 27, 1973: Grace purchases A.D. PEERS properties (Parcel A: 36.62 acres; Parcel B: 228.99 acres); Dec. 27, 1973: Unrecorded agreement for A.D. PEERS royalties; Dec. 27, 1973: Grace leases the BRANDY A ("Hill") property (60.242 acres); June 13, 1974: Grace purchases the DALTON property (12.6 acres); May 17, 1976: Grace leases the NININGER property

Plaintiff M.F. Peers was one of those property owners. Grace purchased two properties from M.F. Peers on December 27, 1972. The first parcel (sometimes referred to as "Parcel I") contains 262.98 acres, and the second parcel (sometimes referred to as "Parcel II") contains 276.42 acres.[5] Grace purchased these properties for their logistical benefit to a vermiculite mining operation; it did not believe at that time that commercially valuable reserves existed on either parcel. (The parties dispute whether Grace so informed M.F. Peers.) Despite this belief, Grace entered into an agreement with M.F. Peers pursuant to which Grace would pay M.F. Peers "per ton" royalties if Grace, in its sole discretion, decided to mine the properties. Grace never mined the properties or paid a per ton royalty to M.F. Peers.

Alfred D. Peers (M.F. Peers's brother) and Elizabeth D. Peers, husband and wife (collectively, "A.D.Peers"), also owned land in Louisa County. Grace purchased two parcels from A.D. Peers on December 27, 1973: the 36.62 acre "Parcel A," on which A.D. Peers resided, and the 228.99 acre "Parcel B." An unrecorded agreement entered the same day established a per ton royalty rate that Grace would pay A.D. Peers, in the event that Grace, in its sole discretion, decided to mine the property. Grace believed that the A.D. Peers properties contained commercially valuable vermiculite reserves. Grace never mined the A.D. Peers properties or paid a per ton royalty to A.D. Peers.

J. Murray and Ruth Hill also owned property in Louisa County, known as the "Brandy Farm." On December 27, 1973, Grace leased a 60.24 acre parcel from the Hills known as "Brandy A." Coincidentally, the Hills also lived on a 37–acre parcel. That parcel is known as "Brandy B." Grace entered into an agreement to pay royalties to the Hills if Grace decided to

mine Brandy A. Under the agreement, Grace had the duty of maintaining the buildings of Brandy B as long as the Hills lived there. The agreement provided in part that, once the Hills vacated Brandy B, "no person shall use or occupy any of the buildings . . . or [Brandy B] without Grace's prior written permission and upon such conditions as Grace may reasonably impose." *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 99 (1993). The Hills notified Grace that its maintenance duties would be triggered on October 1, 1984. Reluctant to assume the added costs of those responsibilities, Grace agreed with Brandy Farm, Ltd. (to which the properties since had been conveyed) to modify the agreement, to permit Brandy, Ltd. to lease the Brandy Farm in its entirety to third parties. *See id.*

On May 17, 1976, Grace leased a 255.53 acre parcel from Elgin H. and Betty Craig Nininger, known as the "Nininger" property. Grace never mined the Brandy or Nininger properties. In 1976, VVL acquired its first property in Louisa County, known as the "Purcell" property. The Purcell property contains 459 acres.

The relative geographic positions of these properties proves to be relevant in this case. The point of reference is Route 22 in Louisa County, which runs east to west. Nininger is located south of Route 22, and all of the other properties are located north of Route 22. Of the northern properties, Purcell is located furthest east. West of Purcell is the M.F. Peers Parcel II. That parcel is a wooded area adjacent to the South Anna River. West of the southern portion M.F. Peers Parcel II are the Brandy parcels. Consequently, M.F. Peers's Parcel II lies directly between the Brandy and Purcell properties. The Brandy properties also lie directly north of the Nininger property, across Route 22. The A.D. Peers properties are

(255.53 acres). In the 1980s, Grace purchased the CAMERON property (74.027 acres) (Apr. 12, 1982), and the AMCLUB property (18 acres) (May 10, 1989).

5. As amended by the deed of correction dated August, 28, 1972.

situated west of M.F. Peers Parcel II and the Brandy properties. West of A.D. Peers is the other M.F. Peers property, Parcel I.

In 1974, part of Louisa County was designated a national landmark. It is called the Green Springs National Historic Landmark (the "Landmark"). HGSI is a nonprofit organization that is dedicated to the preservation of the Landmark. HGSI's amended 1998 corporate charter states its purposes as follows:

> The Corporation is organized for charitable and educational purposes to maintain and protect the beautiful and historic Green Springs area of Louisa County, Virginia, as an important heritage for the Commonwealth of Virginia and her people, without pecuniary gain or profit to its members or to any private individual and not to engage in a regular business of a kind ordinarily carried on for profit. Its purposes shall include historical and ecological research and education; the development of a community land-use plan to eliminate blight and prevent future deterioration; to take and hold by bequest, devise, gift, grant, purchase, lease or otherwise, any property ... without limitation as to amount or value; to sell, convey, or otherwise dispose of any such property and to invest, reinvest, or deal with the principal or the income thereof in such manner as, in the judgment of the Directors, will best promote the general welfare of the Green Springs National Historic Landmark District without limitation, except such limitations, if any, as may be contained in the instrument under which such property is received ... and rendering assistance to like oriented organizations (historical and environmental).

(Pls.' Opp'n Ex. 16.) Many of the properties Grace acquired in Louisa County were located within, or adjacent to, the Landmark. From the time Grace began acquiring properties in Louisa County, Grace faced substantial opposition to its mining plans from HGSI, specifically from one of its directors, Ms. Rae Ely. Ms. Ely frequently appeared in opposition to Grace at meetings of the Louisa County Board of Supervisors.

Having no other property besides Purcell, VVL began mining in 1976. In 1991, Greg Poling of Grace had a conversation with Ned Gumble of VVL, in which Mr. Gumble expressed VVL's interest in buying or leasing Grace's Virginia reserves. Mr. Poling wrote to his superiors, recommending that negotiations with VVL be pursued. Negotiations took place in mid–1991. Grace did not accept VVL's highest offer of $1.75 million, and the negotiations proved unsuccessful. Through discovery, the parties learned of the other side's negotiation strategies. The lowest price Grace was willing to accept was $2.2 million, which happened to be the highest price VVL was willing to pay.

Following the failed negotiations, VVL sought to acquire more reserves. On April 25, 1992, VVL leased Brandy B from Brandy, Ltd. VVL could not begin mining Brandy B until it acquired a permit to do so from the Louisa County Board of Supervisors.

Also in 1992, Ms. Ely attended Grace's annual shareholder meeting in Florida. She met with Grace's Executive Vice President, Donald Kohnken, and attempted to persuade Grace to abandon any plans to mine in Louisa County. A senior Grace officer, Mr. Walsh, was charged with the responsibility of developing a response to Ms. Ely. Grace analyzed the desirability of its various options: holding its unmined properties in Louisa County, an option that entailed substantial carrying costs (such as property taxes, maintenance expenses, and annual rents of advanced royalties), donating its properties to HGSI, or selling its properties to VVL. After meeting with Mr. Poling, among others, Mr. Walsh ultimately recommended that Grace donate its properties to HGSI.

In late 1992, Grace began transferring its Louisa County properties to HGSI.[6] The first transaction occurred on November 30, 1992. By quit claim deed of gift, Grace conveyed two properties to HGSI, one of which was M.F. Peers Parcel II, the parcel located between the Purcell and Brandy properties. Around the same time, VVL was scheduled to appear at a hearing on its application for a permit to mine Brandy B. The November 30, 1992 deed contained the following restrictive covenants:

1. No part of the Real Estate shall ever be used or operated for the purpose of Mining or Mineral Production. The phrase "Mining or Mineral Production," as used herein, shall include, but shall not be limited to, the following:

 a. The extraction, removal or relocation of ores, minerals, stone, gravel and soils (including, but not limited to, vermiculite), regardless of whether or not such material is under, on or above the surface of the Real Estate;

 b. Auger mining, underground mining, strip mining, open pit mining, quarrying, blasting, digging, hydraulic mining, dredging, tunnel mining, deep mining, surface [sic] mining, placer mining, longwall mining, and any other method of mining not mentioned herein which has been practiced, which is currently practiced or which may be practiced at any time in the future.

2. The Restrictive Covenants shall apply notwithstanding any attempt, whether successful or not, at restoration of the Real Estate through the process of reclamation or any other method which restores the Real Estate to the state in which it existed prior to Mining or Mineral Production.

3. No excavation or grading may be made on the Real Estate except for walls, footings, basements, or cellars which such excavation or grading shall be solely incidental to the erection and construction of residential and agricultural structures on the Real Estate.

4. The Real Estate shall be used solely for agricultural and residential purposes. Digging or plowing incidental only to residential or agricultural purposes shall be permitted.

5. Grantor [Grace] covenants and agrees, for itself, its successors in title and interest, and its assigns, that the Restrictive Covenants shall run with the land forever.

(Pls.' S.J. Mem. Ex. 27.) Four days after this conveyance, Ms. Ely of HGSI appeared at a Louisa County Board of Supervisors hearing on VVL's application for a permit to mine Brandy B.

By quit claim deed of gift dated December 22, 1992, recorded December 23, 1992, Grace conveyed to HGSI its remaining Louisa County properties, with the exception of the A.D. Peers property.[7] All of

---

6. The following summarizes Grace's post–1991 transactions. Nov. 30, 1992: Grace quit claim deed of gift of M.F. PEERS parcel II to HGSI, and of JONES properties (containing restrictive covenants); Dec. 10, 1992: Drafts of a quit claim deed of gift and assignment of A.D. PEERS properties, including restrictive covenants; Dec. 22, 1992: Grace quit claim deed of gift of Grace's remaining Virginia properties, except A.D. PEERS, to HGSI (including seven parcels—LLOYD I, HARRIS, M.F. PEERS PARCEL I, AMCLUB, DALTON, LLOYD II, CAMERON) (restrictive covenants on all properties); Dec. 22, 1992: Grace assigns NININGER lease to HGSI (express, written prohibitions on mining); Dec.

22, 1992: Grace assigns BRANDY A lease to HGSI (express, written prohibitions on mining); Jan. 25, 1994: Grace deeds back A.D. PEERS "Parcel A" to A.D. Peers; Jan. 31, 1994: Grace quit claim deed of gift of A.D. PEERS "Parcel B" to HGSI (no written restrictive covenants); May 26, 1994: correction of quit claim deed—LLOYD I and HARRIS restrictive covenants modified only to forbid vermiculite mining, not all mining; Dec. 10, 1999: Release of all restrictive covenants by Grace and HGSI.

7. The December 22, 1992 conveyance included the other M.F. Peers property (Parcel I),

the properties conveyed in December 1992 contained the same restrictive covenants quoted above. Some of those properties were not located in, or adjacent to, the Landmark.

On December 22, 1992, by "Assignment and Acceptance Agreement," Grace assigned its Nininger and Brandy A leases to HGSI. Each of those leases contained the following provision:

> 5. Assignor and Assignee acknowledge that the Agreement creates no obligation upon Assignor to mine the Premises. Assignee, by acceptance of this Assignment, agrees not to mine the Premises and shall exert reasonable efforts to prevent mining on the Premises during the term of the Leasehold Estate created by the Lease Document.

(Pls.' S.J. Mem. Ex. 32.) VVL received its permit to mine Brandy B in January 1993. The permit did not restrict the amount of reserves that could be mined.

In June 1993, HGSI filed a lawsuit in the Circuit Court of Louisa County against VVL, to enjoin VVL and Brandy, Ltd. from mining Brandy B (sometimes referred to as the *"Brandy* suit"). *See Historic Green Springs, Inc. v. Brandy Farm, Ltd.,* 32 Va. Cir. 98 (1993). HGSI contended that Grace's original 1973 Brandy A agreement with the Hills gave the lessee of Brandy A (Grace, and then HGSI) discretion to determine whether mining could occur both on Brandy A and on Brandy B. *See id.* at 101. VVL and Brandy, Ltd. filed a counterclaim, alleging that Grace's Brandy A donation to HGSI breached Grace's duty to the Hills (Brandy, Ltd.), to exercise its contractual discretion (whether to commence mining) in good faith, by assigning the lease with a non-mining provision to a company with no mining expertise. During the pendency of the lawsuit, the court (sometimes referred to as the *"Brandy* court") issued a temporary injunction, which enjoined VVL from mining Brandy B. However, HGSI did not pay the required bond, so the injunction was not effective. On September 28, 1993, the *Brandy* court found that the modification of the 1973 agreement "gave Brandy the right to exercise unfettered control over the entire property, in exchange for which Brandy released Grace from the obligation to maintain and secure the property." *Id.* at 104. The court therefore denied HGSI's claim. The court also found in favor of VVL on its counterclaim, and rescinded the donation. HGSI appealed, but the Virginia Supreme Court denied HGSI's petition on June 20, 1994. Brandy, Ltd. subsequently leased Brandy A to VVL, leaving VVL at liberty to mine both Brandy properties, which it did from 1994 forward.

On December 13, 1993, Grace gave notice to A.D. Peers that it intended to donate the A.D. Peers property to HGSI. Pursuant to a provision in the original 1973 agreement between A.D. Peers and Grace, A.D. Peers had the option of buying back the 37 acre Parcel A in the event that Grace "resold" the property. On January 25, 1994, Grace deeded Parcel A back to A.D. Peers.

Six days later, by deed dated January 31, 1994, Grace conveyed the A.D. Peers Parcel B to HGSI. This conveyance was made subject to the terms of the unrecorded December 27, 1973 agreement between A.D. Peers and Grace, pursuant to which Grace agreed to pay per ton vermiculite mining royalties to A.D. Peers. The January 31, 1994 deed contained no written restrictive covenants not to mine.

By "Correction Quit Claim Deed of Gift," recorded May 26, 1994, Grace and HGSI revised the restrictive covenants of the Lloyd I and Harris properties, originally conveyed as part of the December 22, 1992 donations. The correction replaced

and the Lloyd I, Lloyd II, Harris, Amclub, Dalton, and Cameron properties. *See* note 6

*supra.*

the general prohibition of any type of mining with a restriction that prohibited only the mining of vermiculite. It reads, in relevant part:

1. No part of the Real Estate shall ever be used or operated for the purpose of Vermiculite Mining. The phrase "Vermiculite Mining," as used herein, shall include, but shall not be limited to, the following:

 a. The extraction, removal or relocation of vermiculite ores, regardless of whether or not such material is under, on or above the surface of the Real Estate;

 b. Auger mining, underground mining, strip mining, open pit mining, quarrying, blasting, digging, hydraulic mining, dredging, tunnel mining, deep mining, surface mining, placer mining, longwall mining, and any other method of mining not mentioned herein which has been practiced, which is currently practiced or which may be practiced at any time in the future for the removal of vermiculite ores for the production of vermiculite or vermiculite products.

(Pls.' S.J. Mem. Ex. 40.)

VVL exhausted its Purcell reserves at some point in 1994, but in September of that year, A.D. Peers entered into an agreement with VVL whereby VVL would be permitted to mine Parcel A. In or around May 1995, HGSI stopped making payments on its Nininger lease and the lease was terminated. The Nininger property contains approximately 700,000 tons—representing eight to twelve years' worth—of vermiculite reserves. The property is zoned for vermiculite mining. Since May 1995, Nininger has been, and remains, unleased by any mining company. The Nininger property represents more than one-third of the reserves that VVL originally offered to purchase from Grace.

In 1995 and 1996, the plaintiffs filed three separate actions against the defendants in the Western District of Virginia, which were consolidated in the present case. The plaintiffs complained that the 1992 and 1994 donations from Grace to HGSI removed over 80% of vermiculite mining rights from the "Louisa County mining rights market," from 1993 to mid–1994. VVL claims it participates in that market as a buyer of mining rights in Louisa County. The plaintiffs also allege that the transactions foreclosed over 40% of the raw vermiculite concentrate in the "North American vermiculite concentrates market," from 1993 to mid–1994. According to the plaintiffs, the donations and restrictive covenants prohibiting all future mining of vermiculite evidence a conspiracy between Grace and HGSI to restrain trade in the Louisa County mining rights market. The plaintiffs complain that the alleged conspiracy between Grace and HGSI, in which they agreed (expressly or implicitly) that no vermiculite mining will occur, hinders VVL (or other potentially interested parties) from acquiring Louisa County vermiculite mining rights, and forecloses the supply of raw vermiculite from Louisa County. The donations, the plaintiffs assert, were exclusionary acts employed by Grace, by which Grace achieved (or attempted to achieve) monopoly power in the North American vermiculite concentrates market. VVL alleges that the donations also evidence a conspiracy, entered into between both defendants, to monopolize the same. VVL claims that the Grace–HGSI transactions caused it to suffer increased costs and lost profits. As a remedy, VVL seeks damages for past and future harm, and equitable relief entailing rescission of the conveyances and divestiture of Grace's property interests. The Peers seek lost royalties. Their primarily ground for relief is that Grace violated its duty to exercise discretion in good faith when it donated the Peers' properties to an organization that is opposed to mining. The Peers claim the donations defeated the original purpose of their contracts with Grace, and injured their reasonable expectations under those

contracts, because they sold their land to Grace in exchange for the possibility of obtaining per ton mining royalties.

In Civil Action No. 3:95CV0015, filed February 21, 1995, VVL sued both Grace and HGSI. Count I alleges that both defendants entered into an agreement that restrained trade in violation of § 1 of the Sherman Act; Count II alleges monopolization by Grace in violation of § 2 of the Sherman Act; Count III alleges attempted monopolization by Grace in violation of § 2 of the Sherman Act; Count IV alleges conspiracy to monopolize in violation of § 2 of the Sherman Act against both defendants; Count V alleges violations by both defendants of the Virginia Antitrust Act, *see* Va.Code §§ 59.1–9.1 *et seq.* (Michie 1998 & Supp.1999); and Count VI alleges both defendants conspired to injure another in trade, business, or profession, in violation of the Virginia Conspiracy Act, *see* Va.Code §§ 18.2–499, –500 (Michie 1996 & Supp.1999).

In Civil Action No. 3:96CV0012, filed March 12, 1996, VVL lodged a complaint against Grace on behalf of A.D. Peers, who assigned his claims to VVL. Counts I through V allege non-antitrust state law claims for unjust enrichment, breach of Grace's contractual duty to exercise discretion in good faith, breach of Grace's contractual duty to pay royalties to A.D. Peers, waste, and conversion, respectively. Counts VI through IX allege federal and state antitrust violations, including violation of § 1 of the Sherman Act, monopolization and attempted monopolization in violation of § 2 of the Sherman Act, and violations of corresponding provisions of the Virginia Antitrust Act.

In Civil Action No. 3:96CV0013, also filed March 12, 1996, M.F. Peers and VVL sued ·Grace. M.F. Peers assigned a 65% interest in his claims to VVL. Counts I to V allege non-antitrust state law claims for unjust enrichment, breach of Grace's contractual duty to exercise discretion in good faith, breach of Grace's contractual duty to pay royalties to M.F. Peers, waste, and conversion, respectively. Counts VI to IX allege federal and state antitrust violations, including violation of § 1 of the Sherman Act, monopolization and attempted monopolization in violation of § 2 of the Sherman Act, and violations of corresponding provisions of the Virginia Antitrust Act.

On April 22, 1997, the court granted in part the defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The court dismissed all claims against HGSI on the ground that, as a nonprofit organization engaged in non-commercial activities, HGSI was exempt from liability under the Sherman Act. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.Conn.*, 965 F.Supp. 802, 816 (W.D.Va.1997). The Fourth Circuit Court of Appeals reversed in part, holding, *inter alia*, that it is the nature of the transaction, not the nature of the party to the transaction, that determines whether that party may be liable under the Sherman Act. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.Conn.*, 156 F.3d 535, 541 (4th Cir.1998). The court of appeals further found that the plaintiffs' complaints sufficiently alleged that the transactions between HGSI and Grace were "essentially commercial," subjecting both parties to the antitrust laws. *See id.*

On December 10, 1999, Grace and HGSI executed two "Releases of Restrictive Covenants" with respect to each of the properties donated to HGSI that included restrictive covenants. The releases included the restrictions on the M.F. Peers properties, and provide that Grace, "without any admission of liability and wrongdoing ... does declare the Restrictive Covenants to be null and void, and of no further force and effect, and releases the same to the full extent permitted by law." (Grace S.J. Mem. Ex. 19 at 4.)

Less than· two weeks later, on December 22, 1999, all of the parties filed motions for summary judgment. The following summarizes the general issues on which the

motions are based. Grace and HGSI seek summary judgment on all the plaintiffs' federal antitrust claims. HGSI also moves the court to find that, as a nonprofit preservationist organization engaged in noncommercial activity, and pursuant to the provisions of the National Environmental Policy Act, *see* 42 U.S.C.A. § 4321 (West 1994 & Supp.2000), and the National Historic Preservation Act, *see* 16 U.S.C.A. § 470 (West 1985 & Supp.2000), HGSI should not be subject to treble damages under the Sherman Act. The plaintiffs crossmove for summary judgment on these exemption issues. The plaintiffs and HGSI cross-move for summary judgment on HGSI's First Amendment affirmative defense. In addition, the plaintiffs seek summary judgment on HGSI's "SLAPP suit" affirmative defense, and HGSI seeks summary judgment based on laches and unclean hands. The defendants also move for summary judgment on all of the plaintiffs' state law claims. The plaintiffs crossmove on the state antitrust claim corresponding to § 1, on VVL's Virginia Conspiracy Act claim, and on the Peers' claims regarding Grace's duty to exercise discretion in good faith. The court shall resolve these issues *seriatim.*

On May 4, 2000, the court granted HGSI's motion to exclude the report and testimony of the plaintiffs' only proposed expert on antitrust economics, Mr. Seth Schwartz. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 98 F.Supp.2d 729 (W.D.Va.2000). As a result, the defendants' principal ground for summary judgment is that, without an expert who can provide testimony on economic issues, there is an absence of evidence to support an essential element of the plaintiffs' antitrust claims, *i.e.* the requirement that the plaintiffs define the relevant market in which they allege the wrongful conduct occurred.

## II.

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Issues of material fact are genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court's function is "not ... to weigh the evidence and determine the truth of the matter ... [but to] determin[e] whether there is a need for a trial." *Id.* at 249–50, 106 S.Ct. 2505. "[O]n summary judgment motions in antitrust cases, the Supreme Court has instructed that when there is evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy, courts may not infer that an illegal conspiracy has occurred without other evidence." *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the nonmovant bears the burden of persuasion at trial, the movant may discharge its initial burden either by providing evidence that negates an essential element of the opposing party's case, *see id.* at 331, 106 S.Ct. 2548 (Brennan, J., dissenting) (agreeing with the legal reasoning of the majority, and elaborating on the parties' respective burdens of proof ), or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. If the movant does not satisfy its burden, summary judgment must be denied. If the movant does satisfy its burden, then the burden shifts to the nonmoving party

to present evidence "sufficient to establish the existence of [every] element essential to that [nonmoving] party's case, for which that [nonmoving] party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548. "If the [nonmoving party's] evidence is . . . not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). There must be more than a mere "scintilla" of evidence to support the other party's case. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

When the movant bears the burden of persuasion at trial, as is the case when a plaintiff moves for summary judgment on its own claims, the movant not only must satisfy the initial burden of production on the summary judgment motion by identifying the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, but also the ultimate burden of persuasion on the claim itself by "support[ing] its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331, 106 S.Ct. 2548 (Brennan, J., dissenting). If the movant makes such an affirmative showing, the burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine

issue for trial" on those claims. Fed. R.Civ.P. 56(e).

## A. SHERMAN ACT § 1

■ Section one of the Sherman Act provides: "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C.A. § 1 (West 1997). To establish a § 1 violation, the plaintiffs ultimately must prove four essential elements: (1) the defendants entered into an unlawful contract, combination, or conspiracy; (2) the objects and conduct pursuant to the conspiracy were illegal;[8] (3) the conspiracy imposes an unreasonable restraint on trade; and (4) the concerted action caused "antitrust injury." *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702, 708 (4th Cir.1991); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 n. 10 (4th Cir.1985). The court must determine whether triable issues exist as to each of these elements. *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir.1992).

## 1. EVIDENCE OF A CONTRACT, COMBINATION, OR CONSPIRACY

■ The defendants contend that the plaintiffs do not have sufficient evidence to establish a contract, combination, or conspiracy under § 1. This element distinguishes between independent and concerted action. "Concerted action is the essence of a section 1 claim." *Terry's Floor Fashions*, 763 F.2d at 611. To survive summary judgment on this element, the plaintiffs have "a twofold evidentiary burden." *Laurel Sand & Gravel, Inc. v. CSX Trans., Inc.*, 924 F.2d 539, 543 (4th Cir. 1991). First, they must present direct or circumstantial evidence that reasonably tends to prove that the defendants "had a

---

8. Following *Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*, 924 F.2d 539, 543 (4th Cir.1991), this court will address the second element in its consideration of whether the

plaintiffs have evidence that excludes the possibility that the defendants acted with a legitimate business purpose, under the first element.

'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). Second, this evidence must "tend[ ] to exclude the possibility that the alleged conspirators acted independently," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464) (internal quotation marks omitted), or "based upon a legitimate business purpose." *Laurel Sand & Gravel,* 924 F.2d at 543.

### (A) EVIDENCE OF A CONSCIOUS COMMITMENT TO A COMMON SCHEME, DESIGNED TO ACHIEVE AN UNLAWFUL OBJECTIVE

■ The plaintiffs allege that Grace's donations to HGSI, combined with either written or unwritten *(sub rosa)* agreements not to mine, constitute a contract, combination, or conspiracy to restrain trade in the Louisa County, Virginia, mining rights market. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 156 F.3d 535 (4th Cir.1998) (noting that the plaintiffs "alleged that the *entire* transaction between Grace and HGSI—comprising both the donation of the lands and the nonmining agreements—constituted such an agreement, combination, or conspiracy" (emphasis in original)). The plaintiffs further claim that the conspiracy was designed "to prevent VVL or any other competitor of Grace from acquiring further mining rights in Louisa County, and thereby eventually stop vermiculite mining in Louisa County," (Pl.'s 3d Am. Compl. ¶ 39), and "to permanently foreclose significant sources of supply of raw vermiculite to VVL or any other firm competing with Grace in the production and sale of vermiculite concentrates, and eventually to foreclose to rivals all supply of raw vermiculite

in Louisa County," (Pl.'s 3d Am. Compl. ¶ 40).

The plaintiffs intend to prove that Grace and HGSI entered into a contract, combination, or conspiracy to restrain trade by providing evidence of: (1) Grace's 1992 donation of the M.F. Peers properties to HGSI with restrictive covenants not to mine; (2) Grace's 1992 donation of its remaining properties in Louisa County (except the A.D. Peers property) to HGSI with restrictive covenants not to mine; (3) Grace's 1992 assignment of the Brandy A lease to HGSI with restrictive covenants not to mine; (4) Grace's 1992 assignment of the Nininger lease to HGSI with restrictive covenants not to mine; (5) Grace's 1994 donation of the A.D. Peers Parcel B property to HGSI with an accompanying *sub rosa* agreement not to mine Parcel B; and (6) a *sub rosa* agreement between Grace and HGSI to prevent VVL from mining its own property, Brandy B.

#### (1) 1992 DONATIONS

All of the 1992 donations from Grace to HGSI—both the deed donations and lease assignments—contained express restrictive covenants not to mine the donated properties. The quit claim deeds of gift of nine parcels[9] contained restrictive covenants that provided: "No part of the Real Estate shall ever be used or operated for the purpose of Mining or Mineral Production ... including, but not limited to, [the extraction, removal, or relocation of] vermiculite...." (Pls.' S.J. Mem. Exs. 27, 30.) The 1992 lease assignments contained a similar provision: "[HGSI] agrees not to mine the Premises and shall exert reasonable efforts to prevent mining on the premises...." (Pls.' S.J. Mem. Ex. 32.)

Grace concedes that the donations containing these restrictions satisfy the concerted action requirement of § 1. HGSI, however, argues that there is no evidence of concerted action besides the deeds

---

9. *See* note 6 *supra.*

themselves, and that merely engaging in these transactions is not evidence of concerted action. This argument ignores that these deeds and lease assignments do not simply evidence an agreement to transfer property rights; they also evidence an explicit agreement between the parties to prevent mining on the properties. Evidence of the donations containing restrictive covenants alone satisfies the plaintiffs' burden of producing sufficient evidence to establish concerted action under § 1.[10]

### (2) 1994 A.D. PEERS DONATION

Although Grace concedes that the donations with restrictive covenants satisfy the concerted action requirement, it argues that the plaintiffs have no evidence that Grace's 1994 donation of the A.D. Peers Parcel B property was accompanied by a *sub rosa* agreement between the defendants to prevent mining on the same. The defendants contend that such an agreement is inconsistent with the Parcel A buy-back provision, and also refer to the deposition testimony of HGSI's president, Ms. Ely, denying the existence of such an agreement. Therefore, both defendants contend that the plaintiffs should be prevented from making this argument at trial.

The court is not convinced that the plaintiffs have no evidence of an A.D. Peers *sub rosa* agreement. On the contrary, there is substantial evidence that such an agreement does exist. The plaintiffs produced evidence that Grace issued a September 29, 1992 press release announcing a package of donations to HGSI, and that the original drafts of the 1992 donations included A.D. Peers among the donations subject to the written restrictive covenants. VVL produced a letter from HGSI to Grace indicating that the only reason the written restrictive covenant was abandoned from the A.D. Peers property was because the *Brandy* decision made

clear that such written restrictions would not survive judicial scrutiny. A reasonable jury could conclude from this letter that the restriction itself was not abandoned, but only the written memorialization of that restriction.

The plaintiffs also have evidence that the only reason the A.D. Peers donation did not occur with the rest of the 1992 donations was because HGSI and Grace agreed to delay the donation in an attempt to injure VVL. The 1973 agreement relating to A.D. Peers's original sale of his properties to Grace included a provision whereby A.D. Peers had the option of buying back Parcel A of that property if Grace gave notice of its "intent to resell" the entire A.D. Peers property to a third party. The plaintiffs argue that the reason Grace did not donate the A.D. Peers property to HGSI in 1992 was because Grace believed that if the buy-back provision were exercised, VVL would acquire the mining rights on Parcel A (as it ultimately did). The plaintiffs produced a Grace document to support their argument, which reads in part:

> Grace did not donate ... [A.D. Peers] to [HGSI] because of an option which Peers holds to purchase back 37 acres designated as Parcel "A" if Grace sold the property ... Parcel "A" is thought to contain vermiculite reserves which Peers could lease to Virginia Vermiculite if he exercised the option to purchase the parcel.

(Letter from G.E. Poling to R.C. Walsh (Feb. 23, 1993), Pls.' Reply Mem. Ex. 2.; *see also* Ex. 4 ("If Grace offered to sell [A.D. Peers's] property back he would have, in turn, sold it or leased vermiculite rights to Virginia Vermiculite. Thus, the mining of the Louisa, Virginia area would continue for many more years by our competitor.").) VVL argues that the defen-

---

**10.** The defendants argue that all the restrictive covenants now have been released. However, the timing of the releases, less than two weeks before the defendants filed their original motions for summary judgment,

could lead a reasonable trier of fact to conclude that the releases were not genuine and that a *sub rosa* understanding to prevent mining on the properties continues between the parties to this day.

dants delayed the A.D. Peers donation (and thus prevented VVL from mining Parcel A) to determine whether they could "starve" VVL out of reserves. In late 1992, VVL was attempting to procure permits to mine Brandy B, at that time its only other reserve besides Purcell. Whether a delay of the A.D. Peers donation would be effective depended on how long VVL's permit would allow VVL to mine Brandy B. The plaintiffs produced several internal Grace memoranda which suggest this is exactly what Grace intended. One memorandum states, in relevant part:

> Given the impact permits could have on the [Brandy B] reserves (two years versus ten years), I propose we enter into an understanding with [HGSI] to delay the donation of the Alfred Peers Property until such time as the permits are granted on [Brandy B] property. If the permits restrict [VVL] to a few years of reserves, a multi-year delay on donating Peers could assure [VVL] does not mine Parcel "A" as well.

(Letter from G.E. Poling to R.C. Walsh (Nov. 10, 1992), Pls.' S.J. Mem. Ex. 24.) VVL also provided a memorandum indicating that once VVL obtained a permit to mine Brandy B, Grace no longer thought it important to withhold the A.D. Peers donation:

> The availability of Parcel "A" to Virginia Vermiculite was deemed significant only if Virginia Vermiculite's efforts to open a new mine on the adjacent [Brandy B] property was severely restricted by the pending use permit. A conditional use permit has subsequently been granted to Virginia Vermiculite which will not limit their mining activities substantially. ... I recommend that we ... proceed with the donation of the Peer's [sic] property to [HGSI].

(Letter from G.E. Poling to R.C. Walsh (Feb. 23, 1993), Pls.' Reply Mem. Ex. 2.) Another Grace memorandum discusses a general "strategy of keeping the reserves out of the hands of our adjacent competi-

tor (desirable)" and of "keeping the reserves off the market." (Letter from R.C. Walsh to D.H. Kohnken (Sept. 17, 1992), Pls.' S.J. Mem. Ex. 20, at G002792–93.) All of these memoranda, the initial draft deeds which included the A.D. Peers property in the 1992 donations, and the fact that the A.D. Peers property was not donated until 1994, all constitute circumstantial evidence that Grace and HGSI did reach a *sub rosa* "understanding" to "assure [VVL] ... not mine" the A.D. Peers property. Therefore, summary judgment on this issue must be denied.

### (3) *SUB ROSA* AGREEMENT TO PREVENT MINING ON BRANDY B

■ VVL asserts that HGSI's lawsuit to enjoin VVL from mining Brandy B was the outcome of a prior *sub rosa* conspiracy between both defendants to prevent mining on Brandy B. The basis of the *Brandy* suit was that Clause 12(E) of the original Brandy A lease between Brandy, Ltd. and Grace, which Grace ultimately assigned to HGSI in 1992, provided the Brandy A lessee with rights to control the use of Brandy B. Clause 12(E) provided, in part, that "no person shall use ... Parcel B without [the lessee's] prior written permission." *The Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 99 (1993). The *Brandy* court ultimately found that a modification of the lease divested the lessee of any control over mining on Brandy B.

The defendants claim the plaintiffs have no evidence that Grace and HGSI entered into any prior *sub rosa* agreement to prevent VVL from mining Brandy B. Grace, which was not a party to the *Brandy* litigation, has evidence that it never thought the Brandy A lease provided the lessee with rights to enjoin mining on Brandy B, that Grace was opposed to the *Brandy* litigation, and that HGSI believed the decision to sue was HGSI's alone.

To satisfy its burden of showing a dispute of material fact, VVL produced

evidence that HGSI wrote to Grace requesting that Grace convey the properties adjacent to Brandy B to give HGSI "standing" before the Board of Supervisors to contest the granting of a Brandy B mining permit to VVL. One internal memorandum from Grace's Mr. Walsh, in discussing VVL's plans to obtain permitting for Brandy B, states: "Rae Ely and friends are determined to take on Virginia Vermiculite in what she labels as 'the war of all holy wars' " against VVL. (Letter from R.C. Walsh to D.H. Kohnken (Sept. 17, 1992), Pls.' S.J. Mem. Ex. 20 at G002794.) VVL also argues that the 1992 Brandy A lease assignment, which contained restrictive covenants requiring HGSI to make "reasonable efforts to prevent mining on the premises," when considered in conjunction with Clause 12(E), obligated HGSI to prevent VVL from mining Brandy B. VVL points to a facsimile from HGSI to Grace, wherein HGSI requests that Grace "review and comment" on an HGSI letter attempting to enforce HGSI's ostensible rights under Clause 12(E). VVL also has evidence that a Grace attorney reviewed and edited HGSI's *Brandy* complaint. The plaintiffs allege they are not challenging the litigation itself or HGSI's opposition to the Brandy B permit *per se*, but rather an *ex ante* agreement between the defendants "about how property and contract rights could be exercised to further their their conspiracy." (Pls.' Opp'n at 26.) HGSI's opposition to the permit and HGSI's filing of the *Brandy* lawsuit, the plaintiffs claim, are simply the *ex post* consequences of that agreement.

The only justifiable inference that can be drawn in the plaintiffs' favor, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), is that the alleged *sub rosa* agreement was designed only to give HGSI standing to oppose VVL's permit to mine Brandy B, and to prevent mining thereon through the use of a lawsuit. This argument is foreclosed by the *Noerr–Penning-*

*ton* doctrine, which immunizes from antitrust liability "anti-competitive conduct undertaken to persuade or petition government entities, or to utilize judicial or quasijudicial mechanisms." *Ottensmeyer v. Chesapeake & Potomac Tel. Co.,* 756 F.2d 986, 992 (4th Cir.1985). *See California Motor Trans. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (extending the doctrine to "the approach of citizens ... to administrative agencies ... and to courts"); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."). The *Noerr–Pennington* doctrine is based on the First Amendment, protecting the rights to freely associate and petition the government. *See California Motor Trans. Co.,* 404 U.S. at 510–11, 92 S.Ct. 609. Courts have extended the doctrine to reach concerted acts occurring *ex ante* which ultimately result in actual petitioning of the government, *see Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1367 (5th Cir. 1983) ("Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation."); and concerted efforts to petition permitting boards, *see Baltimore Scrap Corp. v. David J. Joseph Co.,* 81 F.Supp.2d 602, 603 (D.Md.2000) (holding that *Noerr–Pennington* immunity extends to anticompetitive, clandestine attempts to contest the granting of zoning permit).

Under this doctrine, seeking to avail oneself of government action only can violate the antitrust laws when the efforts to do so are a "sham." *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (holding

that litigation is entitled to immunity from the antitrust laws unless it is "objectively baseless," and that a litigant's subjective motivation is otherwise irrelevant); *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 791 F.2d 288, 292 (4th Cir.1986) (elaborating that a sham exists if "the defendant's activity was intended to injure the plaintiff directly rather than through a governmental decision ... where he has no reasonable expectation of obtaining the favorable ruling" (quoting P. Areeda, *Antitrust Law* ¶ 203.1a (Supp.1982).

The plaintiffs do not claim that the "sham" exception to the *Noerr–Pennington* doctrine applies. Although the evidence supports the plaintiffs' position that the defendants entered into the Brandy A lease to block the permitting of Brandy B or to bring a lawsuit to prevent mining on Brandy B, such actions are not illegal under the antitrust laws unless they are undertaken as a sham, without a reasonable expectation of success. The plaintiffs do not allege or produce any evidence that suggests HGSI undertook to influence the permitting board or to bring the *Brandy* litigation without a reasonable expectation of obtaining a favorable ruling, or that HGSI's efforts were objectively baseless. The plaintiffs present no evidence that the alleged *sub rosa* agreement, even if it existed, was anything other than an agreement to persuade the government to prevent mining on Brandy B. That agreement did not itself restrain mining on Brandy B; the restraint would occur only as the consequence of governmental action. *See Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 425, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (distinguishing between restraints that are the intended *consequence* of government action, which are protected, and restraints that are the *means* by which the defendants seek to obtain favorable government action, which are not protected). In other words, even if the defendants entered into an agreement "about how property and contract rights could be exercised to fur-

ther their conspiracy," (Pls.' Opp'n at 26), the plaintiffs provide no evidence that the defendants intended to exercise these rights in any manner other than by petitioning the government. Therefore, the plaintiffs cannot support their evidence of a conspiracy with evidence that the defendants entered into the Brandy A lease to influence the permitting board or to pursue the *Brandy* litigation. Summary judgment on this issue must be granted in the defendants' favor.

## (B) EVIDENCE EXCLUDING INDEPENDENT ACTION AND A LEGITIMATE BUSINESS PURPOSE

The plaintiffs also must produce evidence that "excludes the possibility that the [defendants] ... acted independently or based upon a legitimate business purpose." *Laurel Sand & Gravel,* 924 F.2d at 543. In this case, "it is not necessary that HGSI have shared Grace's alleged anticompetitive motive in entering into a proscribed restraint; it is sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects." *Virginia Vermiculite,* 156 F.3d at 541. HGSI argues that there is no evidence it acquiesced in the restraint with knowledge that it would have anticompetitive effects, and that the evidence only shows that HGSI acted with the legitimate purpose of preserving the Landmark. HGSI's argument has little merit. The plaintiffs have come forward with substantial evidence that Grace had motives other than preservation, including: foreclosing the supply of Virginia mining rights; harming the business of VVL, its sole domestic competitor, by preventing it from acquiring further mining rights in Louisa County; and foreclosing the supply of Louisa County vermiculite concentrates. The plaintiffs also produced evidence that HGSI shared these unlawful motives or at

least knew of and acquiesced in them.[11]

The plaintiffs' evidence begins with the restrictive covenants contained in the 1992 donations and lease assignments—entered into between both defendants—which specifically prohibited mining, "including, but not limited to, vermiculite" mining. These restrictions prevented mining even if restoration methods could be used to avoid problems with preservation. On May 26, 1994, HGSI and Grace signed a "Correction Quit Claim Deed of Gift," which changed the restrictive covenants of two properties that originally were part of Grace's 1992 donations. The corrected restrictive covenants precluded only the mining of vermiculite, but no other type of mining. The properties were not located in the historic area HGSI asserts it was attempting to preserve by entering into the covenants. This evidence tends to prove that Grace's motive was to suppress mining in Louisa County, that HGSI knew of and acquiesced in this motive, and that HGSI's motive was not simply to preserve the Landmark.

The plaintiffs proffered further evidence that Grace's donations were made with the unlawful motive of suppressing competition, including a Grace document outlining Grace's options for the disposition of the Louisa County properties. That document contains questions and handwritten responses, and states in part, "How much would our vermiculite business benefit from Virginia [VVL] having to close down due to reserves? $1.5 million. ... What would be the financial impact on our business if they had *our* reserves? $230 [illegible] / yr.[;] $1.5 million disc." (Letter from G.E. Poling to R.J. Bettacchi & R.H. Locke (July 27, 1992), Pls.' S.J. Mem. Ex. 10 (emphasis in original).) Another document suggests these figures signify an after-tax benefit of $230,000 per year, and a $1.5 million dollar benefit to Grace, dis-

counted to present value. The plaintiffs also proffered the above-referenced evidence of Grace's "strategy of keeping the reserves out of the hands of an adjacent competitor," evidence describing Grace's continued payment of advanced royalties as "primarily a defensive measure serving to keep Virginia Vermiculite from securing those reserves," and evidence Grace initially held onto its properties while "assessing Virginia Vermiculite's ability to continue to operate." (Pls.' S.J. Mem. Ex. 10.) The plaintiffs also have evidence that Grace analyzed the option of holding the reserves, and concluded the benefit would be to "[k]eep Virginia Vermiculite from gaining needed reserves." (Pls.' S.J. Mem. Ex. 30, at G010427.)

Evidence that HGSI knew of and acquiesced in these motives, other than the express restrictions on mining, is found in statements made by HGSI's president, Rae Ely. Ms. Ely testified in a deposition that, since 1972, she has conducted intensive research into the subject of vermiculite mining, and knows "a fair amount" about vermiculite mining in the United States. She sent a facsimile to Grace describing HGSI's motivation to "ensure the preservation of the area and prevent future mining." (Letter from Rae Ely to Bob Walsh (Sept. 28, 1992), Pls.' Opp'n Ex. 21.) That same facsimile describes Grace and HGSI as having "joint and several goals," as maintaining "the Grace/HGSI cooperative undertaking," and as avoiding inclusion of third parties who might "defeat the original objectives." The plaintiffs also claim that HGSI's only motivation in leasing the Nininger property from Grace was to deprive VVL of vermiculite reserves. The plaintiffs allege that HGSI stopped making payments on its Nininger lease because the *Brandy* decision frustrated the defendants' joint goal of driving VVL out of business, which was HGSI's only purpose in retaining that property.

---

11. Although the court of appeals stated that HGSI must have "known" that anticompetitive effects would result, the court reads this statement as requiring that HGSI either have shared Grace's motives, or known of and acquiesced in them with the expectation that the restraints would have an anticompetitive effect.

The plaintiffs provide compelling evidence to this effect. Ms. Ely of HGSI wrote a letter to an attorney for Grace, stating that the effect of the Virginia Supreme Court's denial of HGSI's *Brandy* appeal, "is to open Parcel B AND Parcel A of the [Brandy] tract ... This appears to be enough reserve to keep VVL in business for the duration of the Nininger lease." (Letter from Rae H. Ely to O. Mario Favorito (Aug. 9, 1994), Pls.' S.J. Mem. Ex. 44.) Shortly thereafter, HGSI stopped making payments on its Nininger lease. All of this evidence tends to exclude the possibility that VVL and Grace were acting independently, based on a legitimate business purpose. The defendants dispute the inferences that can be drawn from this evidence, but that is precisely when summary judgment should not be granted.

In its review of the record, the court also has uncovered evidence suggesting—contrary to representations heretofore made by HGSI—that HGSI intends to mine the Louisa County properties. For example, on October 7, 1993, counsel for HGSI wrote a letter to a real estate attorney who served as outside counsel to Grace on a variety of matters, which stated, "In the event my client mines, by separate agreement, my client would agree to transfer all proceeds to W.R. Grace and Company." (Letter from Robert B. Smith, III to Hammill D. Jones (Oct. 7, 1993).) Four days later, that same Grace real estate attorney wrote a letter to Grace's in-house counsel, expressing that, "If Grace has an interest in preventing future mining by Virginia Vermiculite, while affording Green Springs the opportunity for future mining, the above ideas are worthy of consideration." (Letter from Hammill D. "Skip" Jones, Jr. to Kevin T. Grady (Oct. 11, 1993).) On November 12, 1993, the same real estate attorney sent another letter to Grace's in-house counsel, stating, "If the Restated Assignments are effective, Historic Green Springs would acquire the ability to commence mining." (Letter from Hammill D. "Skip" Jones, Jr. to Kevin T. Grady (Nov.

12, 1993).) From these statements a reasonable jury could conclude that Grace and HGSI conspired to transfer the Louisa County properties to HGSI, which would mine the property and give the proceeds to Grace, while preventing Grace's sole domestic competitor from mining.

All of this evidence tends to exclude the possibility that Grace and HGSI acted independently or based on the purpose of preserving the Landmark, or some other potentially legitimate goal. The plaintiffs having proffered such evidence, it is unnecessary at this stage to determine whether the antitrust laws recognize preservation as a legitimate, procompetitive goal. The plaintiffs produced sufficient evidence to establish the existence of a contract, combination, or conspiracy to restrain trade in violation of § 1 of the Sherman Act. Accordingly, the defendants' motions for summary judgment on this issue shall be denied, except as otherwise stated *supra* with regard to *Noerr–Pennington* issues.

## 2. EVIDENCE OF AN UNREASONABLE RESTRAINT OF TRADE

To sustain their § 1 claims, the plaintiffs also must have sufficient evidence to establish that the alleged contract, combination, or conspiracy unreasonably restrained trade. *See* 15 U.S.C.A. § 1 (West 1997 & Supp.2000). To assess the reasonableness of a restraint, courts have taken one of three approaches. First is the "illegal *per se* " rule. This rule classifies as illegal *per se* "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

Second is the traditional "rule of reason" approach. *See Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (holding that "the court must ordinarily consider

the facts peculiar to the business to which the restraint is applied"). Under the rule of reason, elaborate inquiry into the actual conditions of the market is required, because the fact-finder must "weigh[ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). For example, the plaintiff must come forward with evidence of a relevant product and geographic market within which the restraint produces anticompetitive effects, as well as proof of actual anticompetitive effects. *See Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.*, 714 F.2d 351, 355 (4th Cir.1983) (noting that "[t]he plaintiff in an antitrust case bears the burden of proof on the issue of the relevant product and geographic markets"). The requirements under the rule of reason are discussed in greater detail below.

The third approach, the "abbreviated rule of reason," or "quick look" approach, is used when a restraint is not illegal *per se*, but nevertheless has such obvious anticompetitive effects that a full-scale rule of reason analysis is not necessary. *See California Dental Assoc. v. Federal Trade Comm'n*, 526 U.S. 756, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999). In such a case, "no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (quoting *National Soc'y of Prof'l Eng'rs. v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)); *see also Law v. National Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir.1998) ("Under a quick look rule of reason analysis, anticompetitive effect is established,

even without a determination of the relevant market...."). Since evidence of a relevant market is required under the full-scale rule of reason approach, but not under the quick look approach, determining which analysis to use in this case perhaps is the most significant question before the court.[12]

Neither party asserts that the *per se* rules apply in this case. The plaintiffs assert that the "quick look" analysis applies, and move for partial summary judgment (on both their federal and state antitrust claims) that the defendants' conduct unreasonably restrained trade under that approach. The defendants argue that the "quick look" analysis is inappropriate in this case, and move for summary judgment that the plaintiff cannot carry its burden under the full-scale rule of reason approach.

### (A) ABBREVIATED RULE OF REASON

■ In certain situations in which the anticompetitive nature of a restraint is apparent without elaborate market analysis, courts sometimes decide not to undertake a full-scale rule of reason analysis, and instead apply an abbreviated rule of reason approach. If the restraint has obvious anticompetitive effects, the court may proceed directly to weighing the procompetitive and anticompetitive effects, "even in the absence of a detailed market analysis," *National Collegiate Athletic Ass'n*, 468 U.S. at 110, 104 S.Ct. 2948, and ultimately condemn a restraint that has a net anticompetitive effect. Cases applying the quick look approach have involved, for example, restrictions on both price and output which resulted in the "[p]rice [being] higher and output lower than they would otherwise be," *National Collegiate Athletic Ass'n*, 468 U.S. at 107, 104 S.Ct. 2948; "an absolute ban on competitive bidding," *Na-*

---

**12.** As discussed more fully below, defining a relevant market poses a great problem for the plaintiffs in light of this court's May 4, 2000 opinion, which excluded the report and testi-

mony of the plaintiffs' only proposed expert on antitrust economics. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 98 F.Supp.2d 729 (W.D.Va.2000).

*tional Soc'y of Prof'l Eng'rs.,* 435 U.S. at 692, 98 S.Ct. 1355; and "a horizontal agreement among the [defendants] ... to withhold from their customers a particular service that they desire," *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

The United States Supreme Court recently clarified when it is appropriate for a court to conduct a "quick look" analysis in lieu of a full-scale rule of reason analysis. *See California Dental Ass'n v. Federal Trade Comm'n,* 526 U.S. 756, 764–65, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999) (granting certiorari "to resolve conflicts among the Circuits on ... the occasions for abbreviated rule-of-reason analysis"). In *California Dental,* the Federal Trade Commission ("FTC") brought a complaint against a nonprofit association of local dental societies, the California Dental Association ("CDA"), for violation of § 5 of the FTC Act, *see* 15 U.S.C.A. § 45 (West 1997 & Supp.2000), which "overlaps the scope of § 1 of the Sherman Act." *California Dental,* 526 U.S. at 762 n. 3, 119 S.Ct. 1604. The dentist members of the CDA were required to abide by a Code of Ethics, which restricted the type of advertising in which the dentists may engage, to advertising that was not "false or misleading in any material respect." *Id.* at 760, 119 S.Ct. 1604. When a dentist engaged in "discount advertising," she or he had to make certain disclosures, such as the dollar amount of the discount, the length of time a discount would be offered, and the identity of specific groups that qualified for the discount. *See id.* at 761 n. 2, 119 S.Ct. 1604. Applicants could be denied membership in, or expelled from, the CDA for violating these provisions. The FTC alleged that these provisions unreasonably restricted truthful, nondeceptive price advertising (particularly the advertising of "across-the-board discounts," *id.* at 774, 119 S.Ct. 1604) and nonprice (quality) advertising.

On review of the final decision of the FTC, which adopted the findings of an Administrative Law Judge, the Ninth Circuit Court of Appeals found—under a quick look analysis—that these restrictions adversely affected both dentists and consumers of dental services in violation of the FTC Act § 5. The Ninth Circuit held that the price restrictions constituted a "naked" restraint on price competition, and that the proffered procompetitive justification "carried little weight because 'it is simply infeasible to disclose all of the information that is required.'" *Id.* at 764, 119 S.Ct. 1604 (quoting *California Dental Ass'n v. Federal Trade Comm'n,* 128 F.3d 720, 728 (9th Cir.1997)). The Ninth Circuit also held that the nonprice restrictions were sufficiently anticompetitive to justify a quick look analysis, simply because they "are in effect a form of output limitation, as they restrict the supply of information about individual dentists' services." *Id.* (quoting *California Dental,* 128 F.3d at 728).

The Supreme Court vacated the judgment, finding it error to proceed to a quick look analysis without first "scrutiniz[ing] the assumption of relative anticompetitive tendencies."*Id.* at 781. The Court began by noting that, in its previous quick look cases, the anticompetitive effects were so obvious that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 770.

The Court then examined the restraints in question, finding it was not comparably obvious that they would have anticompetitive effects. As to the price restrictions, the court of appeals's finding was insufficient because it "brush[ed] over the professional context and describe[d] no anticompetitive effects." *Id.* at 774. The Court added that it was not obvious *a priori* that the restraints would have any effect at all on competition, noting that whether an across-the-board discount would be more or less effective at conveying information

than a discount that specified the information required by the disclosures was an empirical question. Nor was it obvious that the restraints would not have a positive effect on competition. "As a matter of economics this view may or may not be correct, but it is not implausible." *Id.* at 775. In sum, the threshold question of whether the restraints would have anticompetitive effects was not obvious *a priori.* Since the court of appeals simply presumed that the price restraints would have anticompetitive effects, the Supreme Court held it was error to take the next step, and "shift a burden to the CDA to adduce hard evidence of the procompetitive nature of its policy." *Id.* at 776. The court of appeals similarly erred when it found, with regard to the nonprice restrictions, that a mere restriction of supply constituted a "naked" restraint. The Supreme Court "question[ed] the logic of the Court of Appeals's suggestion that the restrictions are anticompetitive because they somehow 'affect output,' ... absent further analysis ... it is not possible to conclude that the net effect of this particular restriction is anticompetitive." *Id.* at 777 n. 13.

█ The plaintiffs argue that a quick look analysis is appropriate in this case because "[a] restraint on market choice that is unclothed by plausible procompetitive justification is naked and thus illegal under the Rule of Reason without further market inquiry." (Pls.' S.J. Mem. at 26.) The plaintiffs then assert that donating 70–95% of mining rights in Louisa County (depending on what properties are included in the calculation) is a *prima facie* anticompetitive suppression of supply. In support of this proposition, the plaintiffs offer nothing more than the statement that "[i]t plainly had only one effect on the market for vermiculite mining and production: suppressing output and making it more difficult for VVL to compete with Grace." (Pls.' S.J. Mem. at 29.) The

plaintiffs read *California Dental* as "remain[ing] committed to the doctrine that quick look review is warranted where defendants have not offered any logical procompetitive justification," and assert that "where the restraint on its face restricts output if it has any effect at all, there is no reason to subject antitrust plaintiffs and the courts to the costs of specifying the extent of that effect." (Pls.' Reply Mem. at 20.) The bulk of the plaintiffs' analysis concerns the illegitimacy of the defendants' possible procompetitive justifications.[13] In essence, the plaintiffs argue that this court should apply a quick look analysis to find the defendants' actions in violation of Sherman Act § 1 and the corresponding state antitrust law, because restriction of supply is anticompetitive on its face and the defendants did not satisfy their burden of coming forward with a procompetitive justification for their actions.

To follow the plaintiffs' suggestion would violate the principles of *California Dental* in two respects. First, as the Supreme Court made clear, the court cannot simply assume, without further analysis, that a restriction on output is *prima facie* anticompetitive. Second, the type of burden-shifting advocated by the plaintiffs is exactly what the Supreme Court disapproved of in *California Dental.* In the dissenting portion of his opinion, Justice Breyer stated that "[t]he basic question is whether this ... theoretically redeeming virtue in fact offsets the restrictions' anticompetitive effects in this case." *Id.* at 791, 119 S.Ct. 1604 (Breyer, J., concurring in part and dissenting in part). The Court described this as "implicit burden shifting," *id.* at 775 n. 12, 119 S.Ct. 1604, and then clarified who bears what burdens in a "quick look" case:

[B]efore a theoretical claim of anticompetitive effects can justify shifting to a defendant the burden to show empirical

---

13. The plaintiffs also cite much of the evidence tending to indicate that the defendants had anticompetitive motives. The present inquiry, however, is concerned with the effects of the restraint, not the motives behind them.

evidence of procompetitive effects, as quick-look analysis in effect requires, there must be some indication that the court making the decision has properly identified the theoretical basis for the anticompetitive effects and considered whether the effects actually are anticompetitive. Where, as here, the circumstances of the restriction are somewhat complex, assumption alone will not do. *Id.* The Court found that because the Ninth Circuit conducted too "lenien[t][an] ... enquiry into evidence of the restrictions' anticompetitive effects," *id.* at 776, 119 S.Ct. 1604, it was error "to shift a burden to the CDA to adduce hard evidence of the procompetitive nature of its policy." *Id.* "The point is not that the CDA's restrictions necessarily have the procompetitive effect claimed by the CDA; it is possible that banning quality claims might have no effect at all on competitiveness...." *Id.* at 778, 119 S.Ct. 1604. Rather, the point was that "[t]he obvious anticompetitive effect that triggers abbreviated analysis has not been shown." *Id.* The Supreme Court vacated the judgment "[b]ecause the Court of Appeals did not scrutinize the assumption of relative anticompetitive tendencies." *Id.* at 781, 119 S.Ct. 1604.

The threshold inquiry, therefore, is whether an obvious anticompetitive effect is discernable *a priori,* such that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 770, 119 S.Ct. 1604. If this threshold showing is not made, then the abbreviated analysis is not "trigger[ed]," *id.* at 778, 119 S.Ct. 1604, and the court need not analyze the offsetting procompetitive justifications, weigh them against the anticompetitive effects, and determine a net result. Absent a threshold showing of obvious anticompetitive effects, a quick look analysis is inappropriate and the claim must be examined under a full-scale rule of reason analysis. Only if the

anticompetitive effects are obvious does the burden shift to the defendants to proffer empirical evidence that their acts have a legitimate procompetitive justification.

The court acknowledges that donation of at least 70% of the mining rights in Louisa County, at first glance, appears to be a naked restraint of trade requiring some procompetitive justification. However, the court cannot stop at a first glance. *California Dental,* 526 U.S. at 775 n. 12, 119 S.Ct. 1604. A second glance reveals the undisputed evidence that the price of mining rights in Louisa County has not risen at all since 1992. One possible explanation is that Louisa County is too narrow a geographic market for a restriction of supply to affect the price of mining rights. As in *California Dental,* this inquiry is subject to empirical, but not *a priori,* analysis. Given this evidence alone, it is not obvious that the restraints had an anticompetitive effect in an alleged Louisa County mining rights market. Further, whether such a market exists independent of the downstream market for vermiculite is highly suspect. *See, e.g., Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 98 F.Supp.2d 729, 738 (W.D.Va.2000) ("[M]ining rights obtain their value from the downstream product of vermiculite concentrates."). The plaintiffs' evidence of a relevant market is discussed in greater detail below.

Nor is it obvious that the donations caused injury to VVL, let alone a substantial adverse effect on competition "as a whole." *See Advanced Health–Care Serv., Inc. v. Giles Mem'l Hosp.,* 846 F.Supp. 488, 493 (W.D.Va.1994). VVL never had any contractual or property rights to the land at issue; it is not obvious "whether Grace would have allowed mining in the absence of both the donation and the non-mining agreements," *Virginia Vermiculite v. W.R. Grace & Co.-Conn,* 156 F.3d 535, 539 (4th Cir.1998) (emphasis omitted), or whether Grace was *"required* to grant VVL access to its Virginia holdings, on the ground that failure to do so would consti-

tute an improper unilateral refusal to deal." *Id.*(emphasis in original). While the court does address these questions below, it is unwilling to assume the answers under an abbreviated analysis. VVL also acknowledges that it currently has enough reserves to last until 2012—over a decade from now. Though a substantial portion of the merchantable Virginian vermiculite reserves is foreclosed by the donations, it still may be possible for VVL to find and obtain other reserves in Louisa County—specifically the Nininger property [14]—during the next decade.

Finally, even if the plaintiffs' claims are construed to be based on a "leveraging theory," which alleges the defendants unlawfully used their power in one market (*i.e.* the mining rights market) to gain a competitive advantage in another (*i.e.* the concentrates market), it is not obvious that the restraints had any anticompetitive effect in the downstream concentrates market. The price of small and ultra-small concentrates has not increased since 1991, and while the price of mid-size concentrates increased substantially, the cause of the increase is not discernable *a priori.* There is evidence in the record that demand for mid-size concentrates and Grace's costs both increased during the period of the price increase, either or both of which plausibly could account for the increase in price. Grace also has evidence that it lost sales of mid-size concentrate to the customers who suffered the price increase.

The foregoing does not purport to determine whether or not the restraints actually had a net anticompetitive effect. The parties dispute whether the restraints have anticompetitive effects, and whether procompetitive reasons justify the restraints. As in *California Dental,* the point is not

that the restrictions necessarily have an anticompetitive effect, a procompetitive effect, or no effect at all on competition. The point is, the restrictions do not have an anticompetitive effect so manifest as to merit only a "quick look."

### (B) FULL–SCALE RULE OF REASON ANALYSIS

■ Under the traditional rule of reason analysis, the plaintiffs must produce sufficient evidence to prove that the contract, combination, or conspiracy unreasonably restrained trade in a relevant market. The plaintiffs bear the initial burden of providing sufficient evidence to establish the relevant product and geographic markets. *See Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.,* 714 F.2d 351, 355 (4th Cir.1983). The plaintiffs then must have sufficient evidence to show actual anticompetitive effects within those markets. *See Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 709 (4th Cir.1991). If the plaintiffs satisfy their burdens, the burden shifts to the defendant to provide evidence that the restraints are justified by procompetitive virtues. *See Chuck's Feed & Seed Co. v. Ralston Purina Co.,* 810 F.2d 1289, 1294 (4th Cir.1987) (considering pro-competitive justifications in rule of reason analysis); *see also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir.1995) (discussing the parties' respective burdens).

■■ The plaintiffs' initial burden is to produce sufficient evidence to establish that the defendants restrained trade in a "relevant market." [15] *See Satellite Television,* 714 F.2d at 355. Defining the relevant market is a "necessary predicate" of a finding that the antitrust laws were violat-

---

**14.** VVL disputes that the property is "available," because it alleges the Nininger have been unwilling to deal with VVL. For the purposes of the present inquiry, the uncertainty of whether the Ninningers will make their reserves available to VVL reinforces the court's determination that it is not *obvious*

that the restraint has had, or will have, any anticompetitive effect in the market.

**15.** For their § 2 claims, the plaintiffs must define a market they allege the defendants monopolized, attempted to monopolize, or conspired to monopolize. *See* Part II.B *infra.*

ed. *U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Satellite Television*, 714 F.2d at 355 (noting that market definition is necessary because "the concept of competition has no meaning outside its own arena"). The relevant market includes both a product market and a geographic market. *See Satellite Television*, 714 F.2d at 355 (4th Cir.1983). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also Stearns v. Genrad, Inc.*, 752 F.2d 942, 946 (4th Cir.1984) ("If there is cross elasticity of demand or interchangeability of products ... one must deal with a much larger market than if there is none."). Cross-elasticity of demand is "[t]he extent to which customers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). A properly-defined product market thus must take account of which products, if any, compete with the defendant's product, and must include reasonably interchangeable substitute products that limit the defendant's ability to sustain an increase in price above competitive levels. *See Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir.1989). The geographic market is "the area in which buyers or sellers of the relevant product effectively compete.... [T]he geographic market should consist of an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies." *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986) (emphasis, citations, and internal quotation marks omitted). In sum, a relevant market is "the narrowest which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." *Satellite Television*, 714 F.2d at 356 (quoting L. Sullivan, *Handbook of the Law of Antitrust* § 12, at 41 (1977)).

The plaintiffs assert that the relevant market for their § 1 claims is the market for vermiculite mining rights (product market) in Louisa County, Virginia (geographic market). They maintain that the defendants unreasonably restrained trade in Virginian vermiculite mining in order to monopolize the downstream market of vermiculite concentrates. The defendants move for summary judgment on the grounds that the plaintiffs failed to come forward with evidence sufficient to establish the existence of such a market, and that the undisputed facts show that such a market is legally and economically unsustainable. The defendants assert that the proper market for the plaintiffs' claims is the world-wide market for vermiculite concentrates and their reasonably interchangeable substitutes.

■ Market definition typically is a question of fact for the jury. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *International Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 245, 251, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959); *International Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 430 (4th Cir.1986). Therefore, the court must determine whether the plaintiffs' remaining evidence—after the exclusion of the report and testimony of the plaintiffs' only antitrust economics expert, Mr. Schwartz—is sufficient to establish their definition of the relevant § 1 market. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[16]

---

**16.** At oral argument, Grace asserted that a party must present testimony by an antitrust economics expert as a matter of law, and that the court's exclusion of the report and testimony of Mr. Schwartz mandates dismissal of the antitrust claims that depend on market

The plaintiffs claim that the relevant § 1 product market is vermiculite mining rights. In other words, the buying and selling of the intangible rights to mine vermiculite constitute a distinct market, independent of any downstream market for vermiculite concentrates or expanded vermiculite. Acknowledging that it is the only purchaser of mining rights in Louisa County, VVL asserts that if Grace were to increase the price of those rights by 5%,[17] VVL would have to continue purchasing mining rights from Grace because VVL could not turn to another product to produce, due to the expense of converting its vermiculite processing facility. Grace thus would be able to sustain a 5% increase in the price of mining rights. In support of this definition, the plaintiffs offer only the evidence of their nowexcluded expert, Mr. Schwartz, and an affidavit by VVL's plant manager, Mr. Ned Gumble, stating that a vermiculite processing plant only can process vermiculite, and no other type of ore.

The defendants discharge their summary judgment burden both by pointing out that there is an absence of evidence to support the plaintiffs' proposed product market definition, and by providing their own unrebutted evidence that negates the plaintiffs' proposed definition. *See Celotex,* 477 U.S. at 331, 106 S.Ct. 2548 (Bren-nan, J., dissenting). First, the plaintiffs' only evidence of a mining rights product market besides the now-excluded testimony of Mr. Schwartz is the affidavit from Mr. Gumble. The plaintiffs argued at the hearing that the exclusion of Mr. Schwartz is not fatal because the jury could apply the underlying facts to the Guidelines. However, the Guidelines themselves state: "Because the specific standards set forth in the Guidelines must be applied to a broad range of possible factual circumstances, mechanical application of those standards may provide misleading answers to the economic questions raised under antitrust laws." Guidelines § 0. The court will not permit the jury to apply mechanically a testing method which, under its own statement of purpose, discourages mechanical application. Even armed with the Guidelines, no reasonable jury could define a relevant product market based solely on one affidavit stating that a vermiculite processing plant only can process vermiculite ore. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that summary judgment may not be defeated by evidence that is "merely colorable" or "not significantly probative").

Second, under the undisputed material facts in this case, the upstream market has

definition. Although an expert generally is used to establish the relevant market, *see Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 98 F.Supp.2d 729, 736 (W.D.Va.2000), there is no *per se* rule that an antitrust economics expert is required in all antitrust cases. However, as a practical matter and as discussed below, the plaintiffs' lack of any witness to testify about antitrust economics, or to rebut the defendants' economists, proves fatal. *See generally Victus, Ltd. v. Collezione Europa U.S.A., Inc.,* 26 F.Supp.2d 772, 787 (M.D.N.C.1998) ("Economic experts may not be required, but Europa has not provided affidavits of any witnesses who can address such questions.... No reasonable jury could find that a relevant market, as described by Europa, exists.").

**17.** In its Horizontal Merger Guidelines, the United States Department of Justice uses a price increase of 5% lasting for the foresee-able future "[i]n attempting to determine objectively the effect of a 'small but significant and nontransitory' increase in price." *See* Antitrust Division, U.S. Dep't of Justice, 1992 Horizontal Merger Guidelines, 57 Fed.Reg. 41552, at § 1.11 (hereinafter the "Guidelines"). *But see id.* ("However, what constitutes a 'small but significant and nontransitory' increase in price will depend on the nature of the industry."). The plaintiffs and their now-excluded expert rely heavily on the Guidelines in attempting to propose a properly-defined relevant market. This reliance is misplaced in many respects (as detailed below), not the least of which is that, although this case does not involve a merger, "[t]he 'small but significant and nontransitory increase in price' is employed solely as a methodological tool for the analysis of mergers: it is not a tolerance level for price increases." *Id.* at § 1.0.

no significance independent of the downstream vermiculite market (expanded and non-expanded). The defendants proffered testimony from expert economists that the downstream market must be considered in the definition of the mining rights product market. (*See, e.g.,* Mills Aff. at 3 ("Whether vermiculite mining rights can be a relevant [product] market depends on whether there are substitutes to which the users of vermiculite might turn.").) None of the parties are solely in the business of buying and selling mining rights; the only reason VVL and Grace buy vermiculite mining rights is to mine and sell vermiculite. The defense experts testified that rights to mine vermiculite derive their value from the downstream vermiculite product, and that the downstream product competes with other downstream minerals such as polystyrene and perlite.[18] They conclude that a proper definition of the market for mining rights must consider whether these downstream products have a significant or negligible cross-elasticity of demand. (*See, e.g.,* Mills Aff. at 3 ("To determine whether sources of competing materials belong in the same antitrust market with vermiculite mining rights ... requires an investigation of whether these materials restrain the prices of vermiculite mining rights").) Although counsel for the plaintiffs assailed these economic conclusions at

oral argument, the plaintiffs have no qualified antitrust economics witness to rebut this evidence. For example, counsel for the plaintiffs correctly states that cross-elasticity of demand helps establish whether two products are close substitutes only when both are sold at competitive prices. *See* Donald F. Turner, *Antitrust Policy and the Cellophane Case,* 70 Harv. L.Rev. 281, 308–10 (1956). Without an antitrust economics expert to analyze whether the prices were competitive, or to evaluate the significance of any cross-elasticity analysis, the plaintiffs cannot rebut the defense experts' testimony.

The defendants also have unrebutted evidence that downstream competition for vermiculite in fact constrains the price of upstream vermiculite mining rights. Lewis Hash, VVL's first president, informed the Peers—sellers of mining rights—that perlite constrains the value of vermiculite mining rights; there also is evidence that Grace representatives informed the Purcells that the competitive position of vermiculite with other downstream minerals limited the royalty rate Grace would pay for vermiculite mining rights. The plaintiffs have no evidence that potential substitutes for the downstream concentrates do not affect the value of mining rights.[19]

18. The plaintiffs argue that perlite is not a substitute for vermiculite because the prices of perlite and vermiculite move in opposite directions. Without a witness to testify about the economic significance of opposite price movement, this raw evidence cannot rebut the defendants' evidence of substitutability. The parties' respective evidence concerning the reasonable interchangeability of downstream substitutes with vermiculite is discussed in further detail below, with regard to the plaintiffs' § 2 claims. *See* Part II.B.1 *infra.*

19. HGSI also argues the plaintiffs' proposed definition fails because it has not accounted for substitute uses of the land. HGSI's expert, Professor David Mills, testified that preservation competes with mining as an alternative use of the land. The argument essentially is that the proper market should be the broader "land use" market. Professor Mills claims that VVL and HGSI are "land use" competitors, and that a hypothetical monopolist could

not raise the price of mining rights above competitive levels without the buyers of land switching to an alternate use of the land, such as preservation. Professor Mills bases his conclusion on the following two statements: "Vermiculite mining competes with a host of other land uses (agricultural, residential, etc.) for rights to use, transform, preserve, or develop land. Vermiculite mining rights are indispensable for some non-mining land uses for the simple reason that those uses are mutually exclusive with vermiculite mining." (Mills Aff. at 4.) (*See also* Mills Report at 3 (making the same statements).) These statements are not specific facts, do not set forth the specific facts on which they are based, and do not appear to be based on any specific data that would suggest vermiculite mining competes with other land uses or is indispensable for non-mining land uses; they are nothing more than "conclusory statement[s] based on general antitrust theory." *M & M Med.*

In the face of unrebutted evidence of reasonably interchangeable downstream substitutes that constrain the price of upstream mining rights, it is the plaintiffs' burden to conduct at least a rudimentary cross-elasticity analysis that would tend to show these substitutes should be excluded from the product market. *See Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.,* 714 F.2d 351, 356 (4th Cir.1983) ("[The plaintiff] fails to realize that it is exactly this failure to provide as evidence anything more than generalizations about the interchangeability and competition among the [products] ... that is fatal to its submarket theory."); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand ... the relevant market is legally insufficient...."). The plaintiffs did not conduct any analysis to determine whether downstream substitutes should be excluded from the mining rights market, and have no evidence that mining rights do not derive their value from the downstream concentrates. The plaintiffs cannot rest on the affidavit of Mr. Gumble and argument from counsel to prove that the substitutes proffered by the defendants should not be included in the market. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The plaintiffs claim that *Federal Trade Commission v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), holds that evidence of a downstream market is unnecessary to prove a restraint of the upstream market. That case involved an agreement between dentists not to submit x-rays to dental insurers for use in the insurers' determinations of benefits, which resulted in insurers' either having to use more expensive

means of determining benefits, or to abandon their efforts altogether. The plaintiffs argue that anticompetitive effects were shown even without proof that the insurers' failure to obtain x-rays actually "made [downstream] dental services ... more costly." *Id.* at 461, 106 S.Ct. 2009. The Court analyzed the complained-of restraint under an abbreviated rule of reason analysis, and specifically found "actual, sustained adverse effects on competition ... even in the absence of elaborate market analysis." *Id.* at 461, 106 S.Ct. 2009. As the court found an abbreviated rule of reason analysis to be inappropriate in this case under *California Dental Association v. Federal Trade Commission,* 526 U.S. 756, 764–65, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999), *Indiana Federation of Dentists* is inapposite.

■■■ The plaintiffs' omission of the downstream market undermines their proposed definition on another ground. The plaintiffs' contention that the defendants restrained trade in the mining rights market in order to monopolize the downstream concentrates market amounts to a "leveraging" claim. *See* Louis Kaplow, *Extension of Monopoly Power Through Leverage,* 85 Colum. L.Rev. 515 (1985) ("Traditional leverage theory claims that a monopolist's use of its power in its own market to control activities in another market typically represents an attempt to spread its power to the other market."). Several courts have held that a leveraging claim requires proof of at least three elements: "monopoly power in one market, the use of that power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor in another distinct market ... and injury caused by the challenged conduct." *Grand Light & Supply Co. v. Honeywell, Inc.,* 771 F.2d 672, 681 (2d Cir.1985) (quoting *Berkey Photo, Inc. v.*

*Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 164 (4th Cir.1992) (en banc) (as amended). As such, the "alternate land use" claim by Professor Mills does not satisfy the requirements of Federal Rule of Civil Procedure 56(e). *See id.* at 166.

*Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979) (quoting *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984))) (internal quotation marks omitted). *See also Kerasotes v. National Amusements, Inc.*, 854 F.2d 135, 137 (6th Cir.1988) (defining leveraging as "the use of monopoly power in one market to amplify or 'leverage,' a position in another competitive market" (quoting *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 506 (6th Cir.1983))).[20] Therefore, a leveraging claim necessarily requires definition of two markets: the market that provides the leverage, and the "leveraged" market the defendants seek to restrain trade in or monopolize. *See Directory Sales Management Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611 (6th Cir.1987) (dismissing claim that Ohio Bell leveraged its position in the upstream telephone market to restrain competition in the downstream yellow pages market where "the agreements with [upstream] customers appear to have no connection to the [downstream] yellow pages market"); *Advanced Health–Care Servs., Inc. v. Giles Mem'l Hosp.*, 846 F.Supp. 488, 496–97 (W.D.Va.1994) (noting that even if monopoly leveraging exists as an independent antitrust claim, it would fail because plaintiff failed to prove that defendant "gained an unfair competitive advantage in the [downstream] DME market"). The plaintiffs limited their § 1 claims to the upstream mining rights market, and their § 2 claims to the downstream concentrates market. The plaintiffs asserted no claim that incorporates both markets, and thereby rendered themselves incapable of showing any relationship between the two markets for any particular claim. Therefore, to the extent the plaintiffs asserted a "monopoly lever-

aging" claim, their decision to limit their § 1 claim to a single market renders such a claim legally unsustainable.

▪ The plaintiffs assert that the relevant § 1 geographic market is Louisa County, Virginia. They argue that if Grace were to increase the price of mining rights in Louisa County by 5%, VVL would have to continue purchasing those rights from Grace because transportation costs would prohibit VVL from turning to another geographic region, such as South Carolina. VVL claims it is "locked in" to the Virginian mining rights market because sustaining a monopolistic price increase would be less costly than the alternative: mining in South Carolina, and either building a new processing mill there or processing South Carolinian ore in Virginia. In support of this definition, the plaintiffs offer the evidence of their now-excluded expert, Mr. Schwartz; the affidavit from Mr. Gumble stating that a vermiculite mill must be located within a certain distance of the mining site in order for the transportation costs to be low enough to keep the mill profitable; and evidence that costs of switching to another region—*i.e.* transporting vermiculite from another region, or building a new processing mill elsewhere—are prohibitively expensive. Therefore, the only remaining evidence to support the plaintiffs' proposed geographic market definition, after the exclusion of Mr. Schwartz's testimony, concerns transportation, or "switching," costs.

In attempting to satisfy their summary judgment burden, the defendants first maintain that the plaintiffs do not have sufficient evidence to support a definition that limits the geographic market to Louisa County. Specifically, the defendants claim that without the expert testimony of a qualified antitrust expert, the jury would have no means of drawing the necessary inferences from the remaining evidence to

---

**20.** The Fourth Circuit recognized these elements of monopoly leveraging in *M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hospital, Inc.*, 981 F.2d 160, 168–69 (4th Cir.1992) (as amended) (en banc), but reserved judgment on whether monopoly leveraging is cognizable as an independent claim under the antitrust laws. *See id.* at 169.

define the market that the plaintiffs propose.

Since the exclusion of Mr. Schwartz, the plaintiffs rely primarily on *M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hospital, Inc.*, 981 F.2d 160 (4th Cir. 1992) (as amended) (en banc), to assert that they have met their burden of producing sufficient evidence to define a geographic market. The plaintiff in *M & M* sold durable medical equipment ("DME"), such as wheelchairs and walkers, in the Mason County, West Virginia area. When the only hospital in the county founded its own DME business to increase profits, the plaintiff's revenues fell by more than 75%. The plaintiff alleged monopolization and attempted monopolization under the Sherman Act § 2, and proposed to define the relevant geographic market as Mason County. The plaintiff supported this definition with the affidavit of a qualified antitrust economics expert who testified that the patient origin data "strongly suggest that Mason County residents rely predominantly upon Mason County suppliers for their hospital and medical equipment needs." *Id.* at 164 (quoting the expert report). The district court disregarded this affidavit because it found the affidavit to be a conclusory statement that did not set forth specific facts. The Fourth Circuit held that the expert's affidavit should not have been disregarded because it stated the facts on which it was based, and did not need to set forth the data supporting those facts. *See id.* at 166.

At oral argument, counsel for the plaintiffs stated that, in *M & M*, "the geographic market was sufficiently proven by one piece of evidence and that evidence was that county residents predominantly relied on local suppliers." (May 9, 2000, Tr. at 89–90.) The plaintiffs claim that because they have evidence that consumers of Louisa County vermiculite mining rights (*i.e.* VVL) rely not only primarily, but exclusively, on local supply of those mining rights to process Louisa County vermiculite (due to transportation costs), they sat-

isfy their burden of producing evidence sufficient to prove a geographic market limited to Louisa County. In *M & M*, however, it was not the bare facts supporting the affidavit that were sufficient to establish the relevant market; it was the affidavit itself, of an expert whose qualifications "[were] not questioned," which sustained the plaintiff's burden. *Id.* at 164. Unlike in *M & M*, the plaintiffs in the case at bar do not support their definition of such a narrow geographic market with the affidavit of a qualified expert on antitrust economics. The plaintiffs have no witness to testify about why it follows as a matter of economics that a mining company's exclusive consumption of and reliance on Louisa County reserves establishes the relevant geographic market as Louisa County. In other words, no reasonable jury presented solely with the plaintiffs' remaining raw data could draw the economic inferences necessary to define Louisa County as the relevant geographic market.

The defendants alternatively discharge their summary judgment burden by producing unrebutted evidence that the plaintiffs' proposed geographic market definition suffers from fundamental flaws, and as a matter of economics is too narrowly drawn. *See Consul Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir.1986) (cautioning that "[a] market drawn too tightly ... in geographic terms that exclude potential suppliers ... creates the illusion of market power where none may exist"). VVL bases its geographic definition on the premise that, being the only buyer of vermiculite mining rights in Louisa County, the only relevant questions are: where are the reserves that supply the ore to VVL's Virginia mill located; and what response would VVL have to a supracompetitive increase in the price of the right to mine those reserves.

The defendants provide an expert affidavit and report from Professor Mills, stating that a proper geographic market cannot be based solely on the scope of a

single buyer's activity (*e.g.*, VVL's mining activities in Louisa County, Virginia). In other words, a proper geographic definition cannot consider VVL's Louisa County transportation costs alone. The plaintiffs having no witness who could rebut this testimony, the jury only would have Dr. Mills's testimony to rely on in determining the proper economic procedure for defining a geographic market. Therefore, the jury would have no reasonable basis for defining the proposed geographic market in the manner the plaintiffs propose.

Professor Mills states that a proper definition of a geographic market must consider the location of other potential buyers of Louisa County vermiculite, and the location of suppliers to those buyers. He concludes that because mining companies such as VVL and Grace (potential buyers of Louisa County vermiculite) consider reserves available anywhere to them in determining where to establish a plant, and because the geographic market for vermiculite concentrate is at least North America, the potential supply to those mining companies includes reserves not only from Louisa County, but also, at a minimum, reserves from South Carolina and Montana.[21] Therefore, Professor Mills concludes, a proper geographic definition must take these locations into account. *See Consul*, 805 F.2d at 495 (holding that the geographic market must "encompass the area of effective competition between the parties"). The plaintiffs have no witness who could rebut this economic methodology or these conclusions.

Citing their remaining evidence that the cost of building a new mill would prevent VVL from closing its Louisa County mill and opening a new mill elsewhere, the plaintiffs argue that they were "locked in" to the Louisa County mining rights market, and that such evidence is sufficient to sustain their burden. The plaintiffs contend that the Supreme Court recognized lock-in effects as creating a genuine dispute of material fact about the definition of a relevant market in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

In *Eastman Kodak*, Kodak sold photocopier machines and provided services and parts for those machines to its customers. The Kodak photocopiers only could use Kodak parts, which made the photocopiers "unique" products. *See id.* at 456–57, 112 S.Ct. 2072. The plaintiffs, independent service organizations ("ISOs"), also serviced the Kodak machines, but at a lower price than Kodak. When customers began to purchase their own parts, and hire the ISOs only for service, or for service and parts, Kodak implemented a change of policy whereby it only sold replacement parts to customers who used Kodak service. This made it more difficult for ISOs to service Kodak machines, and customers had to switch to Kodak service even though they preferred ISO service. If customers did not want Kodak service, it was too late because they already had bought expensive Kodak machines. In effect, Kodak "locked in" the customers to the sale of service for Kodak machines, *i.e.* the Kodak "service market." The "Kodak service" and "Kodak parts" markets were considered "aftermarkets" of the Kodak photocopier machine "equipment market." The plaintiffs alleged, *inter alia*, that Kodak attempted to monopolize the Kodak service market.

Kodak argued that "Kodak services" was not a relevant market because a single brand of service never could be a relevant product market, as a matter of law. The

21. Undisputed record evidence confirms that there continue to be substantial vermiculite reserves available outside of Virginia. The plaintiffs acknowledge that even today there are unleased properties in South Carolina containing at least 2,000,000 tons of vermiculite concentrates—enough to last VVL's South Carolina division another fifty-seven years. It also appears that Montana now possesses commercially viable vermiculite reserves. A new domestic competitor recently shipped its first load of vermiculite from its mine and mill in Montana.

Supreme Court began its analysis by noting that whether a relevant market exists depends on cross-elasticity of demand. *See id.* at 469, 112 S.Ct. 2072; 481–82. Kodak claimed service was cross-elastic with the equipment, because if Kodak raised the price of service too high, it would lose sales in the equipment market. *See id.* at 470, 112 S.Ct. 2072. The Court rejected this argument, finding that a customer who already had purchased expensive Kodak photocopiers might be deterred from switching to less-expensive, non-Kodak service, because to do so the customer would have to buy a new brand of photocopier. *See id.* at 476–77, 112 S.Ct. 2072. This "switching cost" created a genuine dispute of material fact as to whether the cross-elasticity of demand was reduced or eliminated, *see id.* at 477, 112 S.Ct. 2072, and therefore, whether a relevant "Kodak service" market existed. *See id.* at 482, 112 S.Ct. 2072.

The plaintiffs contend that because they produced evidence that switching to another geographic market would be too costly, there is a genuine issue of material fact as to whether the Louisa County market is a properly-defined relevant geographic market. *Eastman Kodak* is distinguishable because in that case it was the defendant who "locked in" the plaintiffs. Here, it is the plaintiffs who have locked themselves in. In *Eastman Kodak,* the defendant produced equipment that was unique, forcing customers to buy Kodak parts, and by implementing a change in policy with regard to the ISOs, also "forced [customers] to switch to Kodak service even though they preferred ISO service." *See Eastman Kodak,* 504 U.S. at 458, 112 S.Ct. 2072. The plaintiffs in the case at bar entered the Louisa County mining rights market, if such a market exists, with advance knowledge that establishing a mill would entail lock-in costs. This is evidenced by VVL's own Mr. Gumble, who

testified that "The plant must be located within a certain distance to the mining site that allows the cost of transporting the vermiculite ore to remain low enough that the vermiculite operation can be profitable." (Gumble Aff. ¶ 3.)

 A plaintiff cannot establish a relevant geographic market by claiming to be "locked in" a market that it entered knowing in advance that doing so would entail lock-in costs and other economic risks. *See Lee v. Life Ins. Co. of N. Am.,* 23 F.3d 14, 20 (1st Cir.1994) (observing that "the *timing* of the 'lock-in' at issue in *Kodak* was central to the Supreme Court's decision" (emphasis in original)).[22] The Third Circuit Court of Appeals addressed this issue in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 439 (3d Cir.1997). In that case, franchisees of Domino's Pizza brought an antitrust action alleging a relevant product market limited to supplies used in Domino's Pizza stores. The district court dismissed plaintiffs' suit for relying on an impermissibly narrow market. On appeal, the plaintiffs cited *Eastman Kodak* in claiming the market was not too narrow, due to lock-in costs. Affirming the district court, the Third Circuit noted that the lock-in evidence was relevant in *Eastman Kodak* because the change in policy that caused the "lock-in" to Kodak service was not foreseeable by Kodak's customers. The court of appeals distinguished the *Queen City Pizza* case because, as franchisees, the plaintiffs had the opportunity *ex ante* to "assess the potential costs and economic risks at the time they signed the franchise agreement." *Id.* at 440.

The *Queen City Pizza* rationale can be applied to the present case. As Grace notes, when VVL began buying Louisa County mining rights in 1976, it knew that building a Virginia mill would result in lock-in costs. VVL also knew that available vermiculite reserves in that region

**22.** The Fourth Circuit has not addressed the question of lock-in costs under *Eastman Ko-* *dak.*

largely had been purchased by Grace, who likely would seek even more given its then-expected internal vermiculite needs for its own end-use products. The Fourth Circuit previously observed, "VVL entered into the vermiculite market by obtaining rights to one of the few Virginia deposits not already held by Grace." *Virginia Vermiculite*, 156 F.3d at 538. Similar to the franchisees in *Queen City Pizza*, VVL began doing business in Virginia with its eyes wide open, fully able to "assess the potential costs and economic risks at the time." *Queen City Pizza*, 124 F.3d at 440. VVL cannot now claim to be "locked in" to the Louisa County mining rights market. Even if it could, it has no antitrust economics expert who could testify why a lock-in effect alone establishes a geographic market.

A further distinction from *Eastman Kodak* is that the "'commercial realities' faced by consumers" was a disputed fact in that case. *Eastman Kodak*, 504 U.S. at 482, 112 S.Ct. 2072 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Here, evidence of the "commercial reality" of the market is undisputed: mining companies consider reserves available anywhere to them in determining where to establish a plant. The defendants proffered unrebutted expert testimony that, as a result, a properly-defined mining rights market must take into account, at a minimum, reserves from South Carolina and Montana. The plaintiffs have no antitrust economics expert who could testify that their proposed market is not, as the defense experts contend, invalid. "*Kodak* does not hold that the existence of ... switching costs alone ... renders an otherwise invalid relevant market valid." *Queen City Pizza*, 124 F.3d at 439 (footnotes omitted). The plaintiffs' proposed geographic market, therefore, is too narrow.

Since the plaintiffs failed to produce sufficient evidence to establish a proper prod-uct and geographic market, their claims under § 1 of the Sherman Act must fail. Accordingly, it is unnecessary for the court to consider the remaining elements of § 1.

## B. SHERMAN ACT § 2

Section two of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire to monopolize any part of the trade or commerce among the several States." 15 U.S.C.A. § 2 (West 1997). The plaintiffs accuse Grace of monopolizing and attempting to monopolize the vermiculite concentrates market in North America, and accuse both defendants of conspiring to monopolize the same, all in violation of § 2.

### 1. MONOPOLIZATION

■ To prevail on their § 2 monopolization claim, the plaintiffs ultimately must prove three essential elements: (1) possession of monopoly power in a relevant market, (2) willful acquisition or maintenance of that power in an exclusionary manner, and (3) causal antitrust injury. *See Advanced Health–Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 147 (4th Cir.1990). The plaintiffs' threshold burden under § 2 is to define a relevant market in which Grace allegedly exercises monopoly power. For their § 2 claims, the plaintiffs propose to define the relevant product market as vermiculite concentrates, including markets for three different grades of concentrates, "ultrasmall," "small," and "mid-size." The plaintiffs' proposed relevant geographic market is North America, for all of their § 2 product markets.

■ The defendants first challenge the plaintiffs' proposed classification of vermiculite concentrates into separate product submarkets, claiming that although there may be different grades of vermiculite, each grade does not constitute a separate market.[23] HGSI, for example, asserts that

---

**23.** Defining a "submarket" entails no further complexity than defining a "market"; wheth-

the United States grading system exists for convenience, and not because of any market differences, noting that the largest producer of vermiculite, Palabora from South Africa, uses a different grading system. The defendants attempt to discharge their summary burden by providing evidence of reasonably interchangeable substitution between grades, and by pointing to an absence of evidence—specifically, any rudimentary cross-elasticity analysis of these substitutes—to support a submarket definition of any particular grade that excludes the other grades. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

The defendants offer evidence from both parties that different grades of vermiculite can be used interchangeably for various end-uses. Grace produced a VVL investment feasibility study indicating that either mid-size or small grade concentrate can be exfoliated and used to produce a concrete aggregate mixture, which is used in construction of concrete roof decks and industrial buildings, and concrete in-ground pools. According to VVL, using vermiculite to produce concrete aggregate is "the single largest use for vermiculite in North America." (VVL Investment Feasibility Study, Grace S.J. Mem. Ex. 20 at 5.) Grace also produced the report of a VVL expert, Mr. John Stamberg, and deposition testimony from Messrs. Schmelzer and Stamberg, to support its claim of inter-grade substitution for concrete aggregate. This expert report and deposition testimony also evidence inter-grade substitution between small and mid-size vermiculite for other end-uses, including the production of fertilizer products, masonry insulation, refractory blocks, absorbent socks and pads for cleaning oil and chemical spills, and molten steel ladle topping. Grace also produced evidence that either small or ultra-small vermiculite can be used to produce fire-rated drywall.

For their theory that separate markets exist for each grade of vermiculite concentrate, the plaintiffs rely only on the now-excluded expert report of Mr. Schwartz, evidence that the prices vary sharply between the different grades, and evidence that Grace raised the price of mid-size concentrate by 55% (as adjusted for inflation) from 1993 to 1998. The plaintiffs again rely on the Guidelines's 5% figure, stating that Grace would be able to sustain a 5% increase in price for any particular grade because each grade sells at a price more than 5% above the next-smaller size. They further argue that a sustained 55% price increase in mid-size concentrates conclusively establishes that mid-size concentrates constitute a separate market.

The plaintiffs' evidence suffers from fundamental deficiencies. Without an expert economist, the plaintiffs have no evidence that the inferences they draw from the price differences and price increase are economically sound. As indicated above, *see* Part II.A.2.(B) *supra,* the court will not permit the jury to apply the Guidelines mechanically. Market definition does not turn only on price differences or increases in price. The plaintiffs ignore that the relevant product market must include "those products or services which are 'reasonably interchangeable by consumers for the same purposes.'" *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.* 714 F.2d 351, 355 (4th Cir.1983) (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). For example, Grace asserts that the price increase was due to an attempt to regulate "mine imbalance." With increased mining costs and increased demand for mid-size concentrate, Grace asserts that, of the ore it mined, the demand for mid-size was disproportionate to the

---

er any particular proposed market is called a "market" or a "submarket," the plaintiffs' burden, and the inquiry for the court, is the same. *See Satellite Television,* 714 F.2d at 355 n. 5 ("The use of the term 'submarket' is

to be avoided ... a product group or geographic area either meets the listed criteria ... or it does not.... No fiddling with nomenclature will change the analysis or result.").

demand for small grade, resulting in waste of the small grade. As a result, there was excess production of small grade compared with mid-size grade, requiring Grace to discard some production of small grade vermiculite. Grace calls this a demand- and cost-induced price change. The defendants produced evidence that the reason Grace increased the price of mid-size grade was to induce customers to buy more small grade. (*See* Rogan Dep. at 79 ("[I]n 1996 we raised out price for [mid-size] with the expected outcome that we would ... hopefully switch some customers from [mid-size] to [small grade].").) VVL argues that market definition is not concerned with the legitimacy of a price increase. While this evidence does suggest the price increase was not the result of market power—another inference the plaintiffs have no expert to challenge—at this stage the court is concerned more with the suggestion that mid-size and small grade concentrates are interchangeable substitutes. If increasing the price of mid-size vermiculite causes consumers to switch to small grade vermiculite, then the latter appears to be a substitute for the former. The point is not that these inter-grade substitutes necessarily should be included in the plaintiffs' proposed product market—that would be a question for the jury—rather, the point is that the plaintiffs have no evidence to show why the potential substitutes should not be so included.

For the purposes of § 2 no less than § 1, in the face of evidence that different grades of vermiculite are used interchangeably by consumers for the same purposes, it is the plaintiffs' burden to conduct some rudimentary analysis of the products' functional interchangeability, and of competition and cross-elasticity between grades, to show that the substitution is not economically relevant. *See Satellite Television,* 714 F.2d at 355–56; *Adidas Am., Inc. v. National Collegiate Athletic Ass'n,* 64 F.Supp.2d 1097 (D.Kan.1999) (collecting cases). The plaintiffs conducted no such analysis. As in *Satellite Television,* "it is

exactly this failure ... that is fatal to [their] submarket theory." *Id.* at 356.

VVL claims that even if there are not separate markets for mid-size, small, and ultra-small grades of vermiculite, these all are "non-coarse" grades of vermiculite, which would constitute a separate market, independent of the "coarse" grade of vermiculite. Its only evidence of such a "non-coarse" market is the difference in price between "coarse" grade and other grades. As noted, such evidence alone is insufficient to define a relevant product market.

■ In addition to challenging the existence of vermiculite submarkets, the defendants challenge the plaintiffs' limiting the product market to vermiculite, and claim that vermiculite is part of a larger market composed of many different products, including non-vermiculite products, that can be used for the same purposes. To discharge their burden, the defendants produce evidence of competition and reasonably interchangeable substitution between vermiculite and non-vermiculite products for a variety of end-uses, and point to an absence of evidence—again, a rudimentary cross-elasticity analysis of these substitutes—to support a product market definition that excludes the non-vermiculite substitutes. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

Both HGSI and Grace reported substitutes for vermiculite in most of the mineral's uses. These substitutes were not accounted for in the plaintiffs' analysis of the relevant product market. For instance, the defendants produced evidence that peat moss and perlite are substitutes for or complements of vermiculite used in professional soil mixes, and that polystyrene, mineral wool, and perlite can be used instead of vermiculite in spray-on fireproofing for steel beams and columns. Grace itself substituted polystyrene for vermiculite in its lightweight concrete roofdeck and spray-on fireproofing products. In fertilizer products, a large number of consumers eliminated vermiculite in favor of

perlite, polystyrene, ground-up corn cob, or other organic and liquid materials. A non-party fertilizer producer testified that his vermiculite-based fertilizer competes against other manufacturers' non-vermiculite-based fertilizer. The defendants produced evidence that sand-based concrete can substitute for vermiculite in the production of swimming pool concrete aggregate, and that coarse sand is used as a substitute for vermiculite to produce the pool base of above-ground plastic-lined pools. Additionally, the defendants produced evidence that adding vermiculite to dry-wall is not required to satisfy a certain type of fire-rating. Consequently, many dry-wall manufacturers no longer use vermiculite in this product, but use fiberglass or clay instead, which serves the same purpose as vermiculite at a much cheaper cost.

The defense experts conducted a basic cross-elasticity analysis of these substitutes, and concluded that even if these substitutes do not cover all of the potential end-uses for vermiculite, "The existence of a variety of substitutes in a variety of applications indicates that even a hypothetical monopolist supplier of vermiculite would be unable to profitably increase price." (Godek Report at 15.) Neither the plaintiffs nor their experts conducted any such analysis. Without a coherent cross-elasticity analysis showing that these substitutes are not reasonably interchangeable with vermiculite and should be excluded from the market, the plaintiffs as a matter of law cannot carry an essential element of their § 2 monopolization case. (*See also* note 18 *supra.*)

Faced with this array of substitutes and evidence that they compete with and constrain the price of vermiculite, the plaintiffs respond, in an apparent last-ditch effort to define a relevant product market, that many are substitutes for expanded vermiculite, and not vermiculite concentrate. This does not cure their failure to analyze whether the downstream substitutes for expanded vermiculite should or

should not be included in the relevant product market. The plaintiffs cannot now claim plausibly that expanded vermiculite should be excluded from the relevant product market, given VVL's own admissions that most of the vermiculite Grace sold to the public was expanded vermiculite, not vermiculite concentrate, and that VVL sells only vermiculite concentrate (primarily to independent expanders). To attempt to restrict the product market even further in this manner, VVL would require some economic analysis to demonstrate that VVL and Grace even compete in the same market. (Indeed, if the market were limited to sales of concentrate to independent expanders, VVL, not Grace, would have monopoly power, as it "controlled" over 70% of that "market" from 1992 to 1998.) Moreover, evidence that some non-vermiculite products are substitutes for vermiculite concentrate, such as fiberglass for use in fire-rated drywall, combined with the plaintiffs' failure to conduct any cross-elasticity analysis, alone is fatal to the plaintiffs' vermiculite concentrates market theory.

To summarize, the plaintiffs failed to produce evidence of "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Therefore, the plaintiffs do not have sufficient evidence that the defendants' proposed substitutes for vermiculite should be excluded from the definition of the relevant product market. Since no reasonable jury could limit the relevant § 2 product market to vermiculite concentrates or submarkets of vermiculite concentrates under the evidence in the record, summary judgment shall be granted in favor of the defendants on all of the plaintiffs' § 2 claims that require market definition. This includes the plaintiffs' monopolization claims.

2. ATTEMPTED MONOPOLIZATION

■ To establish Grace's liability for attempted monopolization in violation of

§ 2, the plaintiffs ultimately must prove: (1) a specific intent to monopolize; (2) a relevant market; (3) predatory or anticompetitive acts; and (4) a dangerous probability of successful monopolization. *See Advanced Health–Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 147 (4th Cir.1990). In *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), the United States Supreme Court held specifically that a defendant "may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of . . . the relevant market." *Id.* at 459, 113 S.Ct. 884. Having insufficient evidence to establish the vermiculite concentrates market as a relevant product market for their § 2 claims, the plaintiffs are unable to prove that Grace attempted to monopolize any properly-defined market. Summary judgment shall be granted in favor of the defendants on the plaintiffs' § 2 attempted monopolization claims.

The Peers only asserted federal antitrust claims for § 1 restraint of trade, § 2 monopolization, and § 2 attempted monopolization. Having found that the plaintiffs produced insufficient evidence to support those claims, all of the Peers' federal antitrust claims shall be dismissed.[24] The only remaining federal antitrust claim that the court must examine is VVL's § 2 conspiracy to monopolize claim against both defendants.

### 3. CONSPIRACY TO MONOPOLIZE

■ The elements of a § 2 conspiracy to monopolize claim are: (1) concerted action; (2) a specific intent to achieve an unlawful monopoly; (3) commission of an overt act in furtherance of the conspiracy, *see Advanced Health Care*, 910 F.2d at 150; and (4) antitrust injury. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Unlike in an attempted monopolization claim, "it is not necessary that the commit-

ted acts, themselves, be predatory." *Advanced Health–Care*, 910 F.2d at 150. VVL claims that Grace and HGSI conspired to monopolize the alleged vermiculite concentrates market in North America.

#### (A) CONCERTED ACTION

VVL challenges the same conduct for its § 2 conspiracy claim as it does for its § 1 restraint of trade claim. As discussed in Part II.A.1 *supra*, VVL produced evidence that sufficiently excludes the possibility that the defendants acted independently. Grace's reliance on *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998), is misplaced. There the Supreme Court held that the plaintiff could not establish that a vertical arrangement constituted a collective group boycott so as to merit application of the *per se* rule under § 1, that the plaintiff therefore showed no harm to the competitive process, and that a conspiracy to monopolize claim based on the same noncollective behavior also failed to establish harm to the competitive process. In the instant case, the question is not whether a vertical arrangement resulted in a group boycott so as to merit application of the *per se* rule; the court already found in discussing the alleged § 1 conspiracy that VVL produced sufficient evidence that the defendants acted in concert, in what appears to be a type of horizontal arrangement, to harm VVL and to foreclose the Virginian vermiculite reserves. Therefore, *NYNEX* is inapposite.

#### (B) SPECIFIC INTENT AND OVERT ACTS

The defendants argue that because VVL does not have sufficient evidence to establish a relevant market, VVL likewise is unable to establish any particular market in which the defendants allegedly intended to achieve an unlawful monopoly. VVL argues that proof of a relevant market is unnecessary to establish a conspiracy to

---

24. Consequently, the court does not need to address the question of the Peers' antitrust standing, or the viability of their antitrust damages claims.

monopolize claim, because § 2 conspiracies primarily are concerned with concerted action and intent, which does not require precise delineation of the market. Neither the United States Supreme Court nor the Fourth Circuit Court of Appeals has addressed directly whether rigorous economic proof of a relevant market, of the type discussed *supra,* is required for a § 2 conspiracy to monopolize claim.[25]

The Supreme Court made clear, however, that it is not necessary to have as much proof to sustain a § 2 conspiracy claim as is required to sustain a monopolization claim. In *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the Court observed that a § 2 conspiracy claim "is a different offense from the crime that is the object of the conspiracy." *Id.* at 789, 66 S.Ct. 1125 (quoting *United States v. Rabinowich,* 238 U.S. 78, 85, 35 S.Ct. 682, 59 L.Ed. 1211 (1915)). The Court emphasized that concert of action and intent are the principal elements of a § 2 conspiracy to monopolize claim: "Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *Id.* at 810, 66 S.Ct. 1125. A § 2 conspiracy claim does not require proof that the defendants "ever ... acquired the power to carry out the object of the conspiracy." *Id.* at 789, 66 S.Ct. 1125. Rather, a party may be convicted of conspiring to monopolize "any part of the trade or commerce among the several states." *Id.* Similarly, in *United States v. Yellow Cab Co.,* 332 U.S. 218, 67

S.Ct. 1560, 91 L.Ed. 2010 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding that a parent and a subsidiary cannot conspire in violation of the Sherman Act), the Court reiterated that "it is enough if some appreciable part of interstate commerce is the subject of a ... conspiracy," adding that the defendants' "relative position in the field of ... production has no necessary relation to the[ir] ability ... to conspire to monopolize." *Id.* at 225–26, 67 S.Ct. 1560. *See also United States v. Griffith,* 334 U.S. 100, 107 n. 9, 68 S.Ct. 941, 92 L.Ed. 1236 (1948) (noting that "a conspiracy to monopolize violates § 2 even though monopoly power was never acquired" (citing *American Tobacco* )), *overruled on other grounds by Copperweld, supra.*

In *Alexander v. National Farmers Organization,* 687 F.2d 1173 (8th Cir.1982), the Eighth Circuit held that because the essential elements of § 2 conspiracy claims are concerted action and intent to monopolize—not market power—and because a plaintiff only must establish that the conspiracy affected "some appreciable part of interstate commerce," *id.* at 1182 (quoting *Consolidated Laundries,* 291 F.2d at 573), rigorous proof of the relevant market is not required for § 2 conspiracy claims. "A section 2 claim for conspiracy to monopolize ... generally does not require proof of a relevant market, at least not in the manner required in actual and attempted monopolization cases." *Id.* at 1181. The court of appeals cautioned that § 2 conspiracies could not be based on abstract proof of bad intent:

**25.** HGSI cites *Consul, Ltd. v. Transco Energy Co.,* 805 F.2d 490 (4th Cir.1986), for the proposition that § 2 conspiracy claims require proof of a relevant market. In that case, however, the plaintiffs did not allege a claim for conspiracy to monopolize, but only monopolization and attempted monopolization claims. *See Consul, Ltd. v. Transco Energy Co.,* 596 F.Supp. 432, 434 (M.D.N.C.1984). In stating that "proof of a relevant market is always required," *Consul,* 805 F.2d at 494 n.

9, the Fourth Circuit simply disagreed with the Ninth Circuit rule that proof of a relevant market is not always required in an attempt to monopolize case; the Supreme Court later rejected that Ninth Circuit view in *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (holding that attempt to monopolize claims require proof of the relevant market to establish a "dangerous probability" of successful monopolization).

[A] civil Section 2 conspiracy claim, standing alone, does require a minimal showing of product and geographic context—upon what and where the alleged conspiracy is focused—to ensure that a claim is not based upon some abstract showing of unlawful intent. The nature of such proof, however, is simply to show the context of the conspiracy. It need not be as rigorous as the relevant market showing for other Section 2 claims, because actual attainment or "dangerous probability" of monopoly power is not at issue in a conspiracy claim.

*Id.* This view is supported by a recent Supreme Court case discussing attempts to monopolize. In *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), the Supreme Court found that a relevant market determination was an essential element to prove the "dangerous probability" element of an attempt case, but also noted that evidence of unfair or predatory tactics alone, without proof of a relevant market, "may be sufficient to prove the necessary intent to monopolize" for a § 2 attempt case. *Id.* at 459, 113 S.Ct. 884. If defining the relevant market is not required to show intent to monopolize for a § 2 attempt case, it follows that defining the relevant market is not required to show intent to monopolize for a § 2 conspiracy case. *See also Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n,* 891 F.2d 1473, 1484 (10th Cir.1989) ("Conspiring to monopolize is a separate offense under section 2, requiring less in the way of proof than the other section 2 offenses." (quoting *Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1371 (10th Cir.1979)); *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 438 (10th Cir.1983) (holding that for a conspiracy to monopolize claim, "[a] relevant market need not be estab-

lished"); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir.1961) (holding that the relevant market need not be proven in detail to establish a § 2 conspiracy because an accurate delineation of the market is not required to prove intent, the essential element for a § 2 conspiracy claim) (citing *Yellow Cab,* 332 U.S. at 225–26, 67 S.Ct. 1560)).[26]

▮▮▮▮ The defendants argue that because VVL utterly failed to provide sufficient evidence that vermiculite concentrates constitute a relevant product market, and because there is substantial evidence that many other non-vermiculite products should be included in the relevant product market, the defendants potentially could be held liable under § 2 for conspiring to monopolize a market that in fact does not exist. Factual impossibility, however, is not a defense to conspiracy. Under the common law, a person could be guilty of a conspiracy to commit a crime, even though it was impossible in fact to achieve the goal of the conspiracy. *See United States v. Palmer,* 203 F.3d 55, 64 (1st Cir.2000) (observing that factual impossibility is not a defense to conspiracy). Even if it is factually impossible for the defendants to monopolize the vermiculite concentrates market, they still may be held liable for conspiring to do so. As stated above, a § 2 conspiracy claim "is a different offense from the crime that is the object of the conspiracy." *American Tobacco,* 328 U.S. at 789, 66 S.Ct. 1125 (quoting *United States v. Rabinowich,* 238 U.S. 78, 85, 35 S.Ct. 682, 59 L.Ed. 1211 (1915)). The reason that specific market delineation is important in § 1 claims, and in § 2 monopolization and attempted monopolization claims, is because the

---

**26.** The Fifth and Eleventh Circuits do not share the view of the Second, Eighth, and Tenth Circuits. *See Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 311 (5th Cir.1997) ("To establish Section 2 violations premised on attempt and conspiracy to monopolize, a plaintiff must

define the relevant market."); *Bill Beasley Farms, Inc. v. Hubbard Farms,* 695 F.2d 1341, 1343 (11th Cir.1983) ("In this circuit it is clear that relevant market is a necessary element of a conspiracy to monopolize.") (citing *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 849 (5th Cir.1975)).

fact-finder must be able to determine whether the defendants actually restrained trade, actually achieved and maintained monopoly power, or came dangerously close to actually achieving monopoly power. The same specific delineation of the market is unnecessary to prove a § 2 conspiracy, because its "essential elements ... are concerted action and specific intent to monopolize," *Alexander*, 687 F.2d at 1182, and the required intent is simply intent to monopolize a product that "appreciabl[y][is] part of interstate commerce." *Yellow Cab*, 332 U.S. at 225, 67 S.Ct. 1560. Accordingly, the court finds that although a product and geographic context for the conspiracy must be established, a rigorous economic definition of the relevant market is not required to sustain a claim for conspiracy to monopolize under § 2.

■ It is undisputed that Grace and VVL are the second- and third-largest producers of vermiculite in the world (after South Africa's Palabora), and that, until recently, Grace and VVL were the only domestic competitors in the production and sale of vermiculite concentrates. It also is undisputed that vermiculite concentrates are sold throughout the United States, *i.e.* in interstate commerce, and that, at minimum, North America is a relevant geographic context for vermiculite sales. This evidence is sufficient to establish vermiculite concentrates in North America as a product and geographic context and target of the alleged conspiracy between Grace and HGSI.

■ The plaintiffs produced sufficient evidence to create a genuine dispute of material fact as to whether the defendants entered into a conspiracy with the specific intent—*i.e.* common design and purpose—that Grace monopolize vermiculite concentrates production and sales in North America, directed toward the exclusion of Grace's only domestic competitor in that part of interstate commerce. *See American Tobacco*, 328 U.S. at 810, 66 S.Ct. 1125 (holding that a conspiracy is established if

the defendants had "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"); *Williams v. 5300 Columbia Pike Corp.*, 891 F.Supp. 1169, 1175 (E.D.Va. 1995) ("a conspiracy to monopolize must be one that is somehow rationally directed toward the exclusion of competitors."). Internal Grace documents suggest that Grace believed vermiculite concentrates in North America constitute a distinct market. For instance, one Grace document states that "[t]he ability of new competitors to enter the vermiculite market is severely hampered by limited access to commercial vermiculite deposits ... The small number of competitors in the vermiculite market combined with the high barriers to entry for new competitors has limited the intensity of rivalry among competitors." (Grace 1986–1991 Business Plan, Pls.' Opp'n Ex. 33 at G2440–41.) Another Grace document describes Grace's vermiculite business as being "the leader in the North American vermiculite market." ("Grace Vermiculite" Descriptive Memorandum, Pls.' S.J. Mem. Ex. 1 at G16770a.) In addition, the evidence described in the discussion of the § 1 conspiracy is sufficient to create a genuine dispute of material fact as to whether the defendants, acting in concert, conspired to eliminate VVL as Grace's only domestic competitor, and thereby enable Grace to monopolize the production and sale of vermiculite concentrates in North America. That evidence includes, for example: evidence that Grace quantified the value to itself of VVL's closing in Virginia due to a lack of reserves; evidence that Grace entered into the HGSI transactions with an eye toward keeping reserves from VVL; evidence that Grace and HGSI withheld the A.D. Peers donation until they could determine whether VVL would run out of Virginian concentrates; and evidence that HGSI stopped making payments on its Nininger lease when it realized VVL would continue to produce vermiculite in Virginia. This evidence, along with the letters

exchanged between the defendants, indicating HGSI's intent to mine and Grace's intent to keep VVL from mining, also could lead a reasonable jury to find that HGSI stood to gain separately from Grace's acquisition of monopoly power in the alleged market for vermiculite concentrates, and in that sense can be deemed to share in Grace's alleged specific intent to obtain a monopoly. Alternatively, a reasonable jury could find, for example, that HGSI intended that Grace obtain a vermiculite concentrates monopoly so that HGSI would not be threatened by any mining company in Virginia: VVL would be out of business in Virginia, and Grace would not mine in Virginia pursuant its mutual agreement with HGSI. All of this evidence reasonably could establish that Grace and HGSI believed vermiculite concentrates in North America constitute a market, that Grace specifically intended to monopolize that alleged market, that HGSI stood to gain from such monopolization and shared Grace's intent, and that the Grace–HGSI transactions were conspiratorial efforts to eliminate the only other domestic producer of vermiculite concentrates, VVL, from that part of interstate commerce. Therefore, summary judgment on these issues shall be denied.

### (C) ANTITRUST INJURY

The Clayton Act provides a private party—as opposed to the United States Department of Justice or the Federal Trade Commission—with standing to sue for violations of the Sherman Act. Clayton Act § 4 authorizes private actions for treble damages, and § 16 authorizes private actions for injunctive relief.[27] The United States Supreme Court established several requirements to determine whether an antitrust plaintiff has standing to seek anti-

trust remedies under the Clayton Act. *See Cargill v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 & n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219–20 (4th Cir.1987). The first requirement is that the plaintiffs have suffered "antitrust injury"; if this is satisfied, then other factors, such as direct causation in fact between the plaintiffs' injury and the defendants' alleged antitrust violations, also must be considered to determine whether the plaintiffs may sustain a claim under the Clayton Act. *See Cargill*, 479 U.S. at 110 n. 5, 107 S.Ct. 484; *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The court shall examine antitrust injury in this Part, and the other standing requirements in the next Part.

The Supreme Court defined antitrust injury in *Brunswick*:

> [A]ntitrust injury ... is ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick*, 429 U.S. at 489, 97 S.Ct. 690 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)) (holding that the defendant's acquisition of defaulting bowling centers such that the centers remained in business, did not result in "antitrust injury" to the centers' competitors,

---

**27.** Section 4 provides, in relevant part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained." 15 U.S.C.A. § 15(a) (West 1997). Section 16 provides, in relevant part,

that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C.A. § 26 (West 1997).

who would have realized market share gains had the centers gone out of business). Specifically with regard to § 2 conspiracy claims, the Supreme Court held in another case that a plaintiff must have sufficient evidence to establish "harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). *See also id.* at 139 (applying this principle to § 2 conspiracy claim). To prove harm to the competitive process, the plaintiffs must prove that "the damages sought ... flow from that conduct which is proscribed by the antitrust laws." *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1325 (4th Cir.1995) (citation omitted) (emphasis omitted). *See also Sullivan v. National Football League*, 34 F.3d 1091, 1097 (1st Cir.1994) ("[A]n action harms the competitive process 'when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods.'" (quoting *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir.1990))).

VVL may satisfy its burden by producing evidence that the damages its seeks flow from the defendants' alleged § 2 conspiracy to achieve an unlawful monopoly in vermiculite concentrates, such that the concerted action obstructed achievement of lower vermiculite concentrates prices,[28] a better vermiculite concentrates product, or more efficient vermiculite production methods. As indicated in a damages report prepared by VVL's damages expert, Mr. Robert Sansom, VVL claims four types of damages:

1. Past lost profits, from 1993 to 1994. VVL claims that production on its Brandy B property declined from 1993 to 1994 when VVL was delayed in opening the Brandy B reserves. It claims it was delayed because the *Brandy* court issued a temporary injunction that prohibited it from mining the Brandy property.[29]

2. Past and future transportation damages, from 1994 to 2012. VVL alleges that it could not conduct off-road hauling of the ore and tailings mined at the Brandy and A.D. Peers Parcel A properties to the pro-

**28.** VVL produced evidence that the price of mid-size concentrate increased by 55% (adjusted for inflation) from 1993 to 1998. However, in light of the defense economists' testimony that these higher prices were due to increased demand and increased costs, and VVL's absence of any economic testimony the price increase was not caused by these conditions, which are wholly consistent with a competitive market, no reasonable jury could conclude that these higher prices "flowed from" conduct that is proscribed by the antitrust laws.

**29.** VVL's damages report, prepared by Mr. Sansom, refers only to production decline on the Brandy B property, due to the *Brandy* injunction, as supporting its claim of past lost production profits. On the second day of oral argument, counsel for VVL alluded to past lost profits due not only to production decline on the Brandy B property, but also due to VVL's having been denied access to the Peers, the Nininger, and Brandy A properties from 1992 to 1993, which VVL allegedly would have obtained at lower royalty rates and begun mining. Aside from two very brief, unsupported statements to this effect in VVL's opposition papers, (*see* Pls.' Opp'n at 30, 32), counsel's statement at oral argument was the only indication that VVL claimed past production losses for anything other than production decline on the Brandy B property. Those statements are unsupported by any record evidence, and are not referred to anywhere in VVL's August 1999 damages report. Moreover, on the first day of oral argument, counsel for VVL recognized that VVL did not include these past production profits in its damages calculations, and suggested that VVL purposefully did not do so. (*See* May 10, 2000 Tr. at 104 ("VVL would have had the Nininger and all other reserves much earlier.... It would have meant we would have had reserves at a lower royalty rate for a lot longer.... Had we presented damages on those assumptions, we would have gotten a much larger figure. We would have then been accused of running up damages. What we chose to do was to choose a more conservative alternative not following that scenario ...").) The court therefore construes VVL's past lost production profits claim as encompassing only the losses caused by a decline in production on the Brandy B property from 1993 to 1994.

cessing plant at Purcell, due to HGSI's M.F. Peers property being situated directly between Purcell and the others. VVL bases its past transportation costs figure on actual costs of on-road hauling of raw ore to VVL's plant, and bases its future transportation costs on the projected costs of hauling raw ore to the mine, and pumping fine tailings back to the mine site for restoration, up to the time that it anticipates it will deplete its Virginia reserves.

3. Future plant move damages, from 2000 to 2001. VVL claims that in 2000–2001 it may move its mill from the Purcell property to the Brandy property, which would require that VVL expend costs to restore the Purcell site, ponds, and roads. VVL asserts these damages only as an alternative to the future transportation damages, as an effort to mitigate those damages. By moving its mill, VVL will not have to conduct off-road hauling and incur future transportation costs.

4. Future lost profits, from 2012 to 2020. VVL claims it will deplete its current Virginia reserves in 2012 because it does not control the Peers' properties. VVL asserts that if it had the Peers' properties, it could continue to mine at its current rate of production until 2020. Assuming stable market conditions, a stable production rate, a stable profit margin, and assuming VVL obtains no additional Virginia properties, such as Nininger, VVL asserts it will lose profits from 2012 to 2020 due to the foreclosure of the Peers' properties.[30]

The defendants argue that the past lost profits allegedly due to the *Brandy* court's temporarily enjoining VVL from mining Brandy B, do not constitute "antitrust in-

jury." As discussed above, VVL cannot support its conspiracy claim with evidence that the defendants intended to prevent mining on Brandy B. Consequently, any injury resulting from the *Brandy* litigation does not flow from an anticompetitive aspect of the alleged conspiracy, and does not constitute antitrust injury. VVL's past lost profits claim is no longer viable, and summary judgment shall be granted in the defendants' favor on this issue.

■ The defendants also assert that the transportation costs are not antitrust injury. Costs of transporting ore to a mill, they claim, are part of doing business as a mining company, and do not constitute harm to competition. The defendants observe that although the M.F. Peers property lies between VVL's Brandy and Purcell properties, VVL's using the road that circumvents the M.F. Peers property (Route 22) to transport ore from Brandy to the mill at Purcell only results in an inconvenience of one to two miles of additional transportation distance. The defendants cite evidence that both VVL and Grace transport South Carolinian ore over twenty miles to their respective mills in South Carolina. The question, however, is not whether transportation costs are a normal part of doing business, but whether VVL has evidence that the defendants harmed the competitive process by their alleged conspiratorial acts. Such evidence might include, for example, evidence that the defendants' alleged conspiratorial acts intentionally were designed to render VVL's production methods less efficient. VVL produced evidence that shortly after VVL approached Grace to inquire about using the M.F. Peers property to conduct off-road hauling between VVL's Brandy prop-

---

30. Attempting to buttress the speculative nature of these future lost profits, VVL claims that it currently has a depreciated business value because it does not control the donated reserves, stating that "[a]ny investment banker would conclude that VVL's worth is lessened by denial of access to reserves, and the denial of these reserves is a concrete present injury that ... limits the amount VVL could be sold for today." (Pls.' Opp'n at 33.) VVL produced no evidence from any investment banker to support damages for lost "present business value," or "going concern value," and did not refer to such damages in its damages report. Having no specific evidence to support this vague claim, VVL cannot recover damages based on a general depreciation of its current business value from its lack of control over more reserves than it currently possesses.

erty and VVL's mill, Grace donated the M.F. Peers property to HGSI with restrictive covenants relating to using the property to transport vermiculite, even though none of the parties believed that that particular M.F. Peers parcel contained vermiculite reserves. VVL also produced evidence that it sustained transportation costs due to its inability to use an off-road transportation route through the M.F. Peers property. By this evidence, a reasonable jury could infer that Grace purposefully donated the M.F. Peers property to make its only domestic competitor, VVL, incur transportation costs (in turn furthering the conspiracy to monopolize) and be less efficient in production. Based on evidence that VVL incurred such costs, a reasonable jury could conclude that VVL's production methods were rendered less efficient by the defendants' allegedly conspiratorial acts, resulting in harm to competition. Although two miles is not a long distance to travel, VVL produced sufficient evidence that these transportation costs, if caused in fact by the defendants' actions, "flowed from" the defendants' alleged conspiracy to monopolize—which included the donation of the M.F. Peers property to HGSI—and thus constitute antitrust injury. The defendants provided evidence that VVL could remain profitable with hauling distances up to twenty miles, and claim that competition therefore was not harmed. Although the defendants' evidence is compelling, this is the type of factual dispute that must be heard and resolved by the jury.

The court must assure itself that VVL provided sufficient evidence to establish that its other claimed damages constitute antitrust injury, even though the defendants only asserted an "antitrust injury" challenge to the transportation costs and past lost profits damages. To the extent the "plant move" damages are mitigating damages VVL intends to sustain as an alternative to the future transportation costs, they also constitute antitrust injury, because costs incurred to mitigate costs that flow from an antitrust violation, also

flow from that violation. Grace produced evidence that VVL's decision to move its plant is an independent business decision, completely unrelated to any conduct by the defendants. Whether VVL decided to move its plant to mitigate its future transportation damages, or whether it did so as an independent business decision, is a question for the jury. With regard to VVL's future lost profits claim, the court shall assume for the moment that VVL has sufficient evidence to establish that its future lost profits are reasonably ascertainable and will be caused in fact by the defendants' alleged conspiratorial actions. If the defendants conspired to enable Grace to monopolize the concentrates market, and foreclosed reserves to eliminate VVL from that market in furtherance of the conspiracy, a reasonable jury could determine that future lost profits damages resulting from the foreclosure of those reserves would be the type of injury that the antitrust laws were designed to prevent. VVL having produced sufficient evidence to establish each of the essential elements of its conspiracy to monopolize claim, summary judgment shall be denied on this issue.

## C. CLAYTON ACT REMEDIES

### 1. DAMAGES (§ 4)

■■■ " 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' . . . the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)). Whether VVL may recover for the injuries it allegedly suffered by reason of the defendants' actions requires inquiry into: (1) causation in fact between an antitrust vio-

lation and harm to the plaintiff; (2) the risk of duplicative recovery by multiple antitrust claimants; (3) the extent to which the claim is based upon speculative, abstract, or impractical measures of damages; (4) the (proximate) causal connection between the alleged violation and the harm suffered; and (5) the relationship of the injury alleged to the forms of injury about which Congress was concerned when it created a private remedy. *See id.* at 537–43, 103 S.Ct. 897; *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 219–20 (4th Cir.1987). If a genuine dispute of material fact is shown, "the fact of injury and the amount of damages are questions for the jury to decide." *International Wood Processors v. Power Dry, Inc.,* 792 F.2d 416, 431 (4th Cir.1986). The defendants argue that VVL did not produce sufficient evidence of causal injury in fact as to any of its damages claims, that those claims pose an unreasonable risk of duplicative recovery, and that all VVL's claims for future damages are impermissibly speculative. If VVL's future lost profits damages claim is so speculative as to not be ascertainable by just and reasonable inference, it will be unnecessary to examine all of the *Associated General* factors with regard to future lost profits. Accordingly, the court shall begin with VVL's future lost profits claim for damages.

### (A) FUTURE LOST PROFITS

█ The calculation of VVL's future lost profits assumes stable market conditions, stable production levels, and stable profit levels over a period of twenty years, from the present until the year 2020. (*See* Sansom Report at 3 (assuming that VVL's current "tons per year" production rate, and VVL's average annual profits, will remain constant); Sansom Dep. (Oct. 27, 1999) at 50 (same).)

The defendants argue that whether VVL will accrue future lost profits is so speculative, and based on so many assumptions, that no reasonable jury could award VVL lost profits damages for a twenty-year period in the future. The first assumption is that VVL will deplete its Virginia reserves in 2012. The undisputed evidence is that the Nininger property currently is unleased, and if VVL obtained it, it would not deplete its reserves in Virginia until 2020. The second assumption is that vermiculite market conditions will be stable over a twenty-year period, from now until the year 2020. Grace produced evidence, largely undisputed, that the vermiculite market has changed dramatically over the past ten years. Undisputed evidence shows that domestic sales of imported midsize vermiculite increased from 5,365 tons in 1992 to over 43,000 tons in 1998, and overall imports more than doubled from 1991 to 1998. The defendants also produced evidence, in the form of investment reports and deposition testimony, that demand for vermiculite has decreased over the past ten years due to increased use of and/or demand for substitute products. It also is undisputed that a new entrant in the vermiculite market recently began operations in Montana.

The court recognizes that proof of the extent of damages is subject to a more lenient standard of proof. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft,* 828 F.2d 1033, 1043 (4th Cir.1987). Notwithstanding the lenient standard, antitrust damages are not recoverable if they only can be determined "by mere speculation or guess." *Story Parchment,* 282 U.S. at 563, 51 S.Ct. 248. The evidence must be sufficient to establish the extent of the damages "as a matter of just and reasonable inference." *Id. See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("[I]n antitrust actions as in others ... future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable."); *Eastern*

*Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.,* 795 F.2d 329, 337 (4th Cir.1986) (affirming exclusion of damages expert on ground that his testimony was based on assumptions that were "speculative and not supported by the record"); *see also Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 382 (7th Cir.1986) (holding that even if liability had been upheld, the judgment could not be sustained because the expert's ten-year projection of lost profits bore no relation to economic reality).

VVL's future lost profits would be ascertainable ·only by speculation; the amount of such damages, over a twenty-year period, is unprovable. No reasonable jury could award VVL future lost profits for such an arbitrarily long damages period, given the unleased status of the Nininger property, the numerous letters suggesting that HGSI may change its position and permit mining on its properties, the instability of the vermiculite market, the increased demand for substitute products, and the entrance of new market participant; all of which suggests that the market may change dramatically over the next twenty years. Evidence that foreign vermiculite imports substantially increased since 1992, and evidence that foreign vermiculite is of higher quality than Virginia vermiculite, calls into question whether a market for *Virginia* vermiculite will exist at all in twenty years. The evidence does not show the extent of such damages as a matter of "just and reasonable inference." VVL's future lost profits damages claim being unsupportable as a matter of law, summary judgment shall be granted in favor of the defendants on this issue.

### (B) TRANSPORTATION COSTS

#### (1) CAUSAL INJURY IN FACT

The crux of an antitrust action is individual injury in fact. *See Windham v. American Brands, Inc.,* 565 F.2d 59, 66 (4th Cir.1977); *see also Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 129 (4th Cir.1995) (noting that injury in fact is required to prove damages, and also is relevant to determine standing); M. Sean Royall, *Disaggregation of Antitrust Damages,* 65 Antitrust L.J. 311, 315 (1997) ("In order to establish the fact of injury, an antitrust plaintiff must demonstrate that it suffered 'some damage' as a causal result of the defendant's violation." (footnote omitted)). The standard is whether VVL produced sufficient proof of *"some* damage flowing from the unlawful conspiracy.... It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (emphasis in original).

VVL proposes two causal links to establish the defendants' conduct was a "material cause" of its transportation costs damages. First, the donation with the restrictive covenant not to mine caused VVL to incur transportation damages because the restrictive covenant prohibited the transportation of vermiculite across the M.F. Peers property. As a direct result, VVL could not transport ore across the same and had to use the road and incur transportation costs. Second, the donation with the restrictive covenant not to mine caused VVL to incur transportation damages because the donation prevented VVL from obtaining the M.F. Peers property, and but for the donation, it would have obtained the property, either because Grace voluntarily would have sold the property to VVL, or because Grace would have been required to sell the property to VVL pursuant to an antitrust duty to deal. VVL claims its inability to obtain the property thus resulted in its having to use the road and incur transportation costs.

The defendants challenge these causal links, by claiming: (1) the relevant provisions of the restrictive covenant not to mine do not prevent the transportation of

ore across M.F. Peers if that ore was not mined from the M.F. Peers property; (2) it was not the restrictive covenant, but VVL's own lack of preparedness to transport across M.F. Peers, which was the material cause of VVL's transportation damages; (3) Grace would not voluntarily have sold to VVL; (4) Grace had no duty to deal with VVL. Bearing in mind the court's role at the summary judgment stage when the nonmoving party bears the burden of proof at trial, as VVL does regarding causation, the question is whether VVL has sufficient evidence to support its position, not whether the defendants have sufficient evidence to support their position.

The first question is whether there is a genuine dispute of material fact about whether the M.F. Peers restrictive covenant prevents the transportation of ore across the M.F. Peers property. "[O]nly an unambiguous writing justifie[s] summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' ... If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact." *Atalla v. Abdul-Baki,* 976 F.2d 189, 192 (4th Cir.1992) (second alteration in original) (quoting *Bear Brand Hosiery Co. v. Tights, Inc.,* 605 F.2d 723, 726 (4th Cir.1979) (quoting *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.,* 354 F.2d 214, 216 (4th Cir.1965))); *see also Combs v. Dickenson–Wise Med. Group,* 233 Va. 177, 355 S.E.2d 553, 557 (1987) ("[W]henever it is necessary to refer to testimony of witnesses in order to ascertain the contract, or to ascertain facts in the light of which the contract is to be construed, then the court is bound to refer such controverted matters of testimony to the decision of the jury." (quoting *Camp v. Wilson,* 97 Va. 265, 33 S.E. 591, 592 (1899))). The restrictive covenant reads, in relevant part:

1. No part of the Real Estate shall ever be used or operated for the pur-

pose of Mining or Mineral Production. The phrase "Mining or Mineral Production," as used herein, shall include, but shall not be limited to, the following:

a. The extraction, removal, or *relocation* of ores, minerals, stone, gravel and soils (including, but not limited to, vermiculite), regardless of whether or not such material is under, on or above the surface of the Real Estate.

(Pls.' S.J. Mem. Ex. 31 (emphasis added).) The defendants claim that the prohibition only applies to relocation of ore mined from the M.F. Peers property, and that this provision does not prohibit relocation (transportation) of ore across the property, as long as it is ore that already was mined from another property. In support, Grace cites handwritten notes of Mr. Sansom, who stated that Ms. Ely told him that she thought the provision only applied to ore donated by Grace. VVL responds that the restrictive covenant prohibits relocation of ore across "the surface of" the property, and does not specify whether or not that ore must have been mined from the M.F. Peers property. VVL provides evidence that no party believed that this M.F. Peers parcel contained vermiculite, calling into question the defendants' construction of the provision as applying only to M.F. Peers vermiculite. This evidence also calls into question the defendants' intent in forbidding the relocation of vermiculite ore. The clause being susceptible of two reasonable but contrary interpretations, and the intent of the contracting parties being in issue, the question is one for the jury.

The second question is whether there is a genuine dispute of material fact as to whether it was VVL's own lack of preparedness to transport across the M.F. Peers property that caused its transportation damages, and not the donation combined with the restrictive covenant not to mine. The M.F. Peers property potentially is subject to regulation and permitting requirements by the United States Army

Corps of Engineers ("Army Corps"), because M.F. Peers is located in a wooded area adjacent to the South Anna River, "waters of the United States," over which the Army Corps has authority. *See* Clean Water Act of 1977 § 404, 33 U.S.C. § 1344 (West 1986 & Supp.2000); *see also* 33 C.F.R. §§ 320, 323, 328, 330 (1999). Grace argues that VVL would have had to obtain various permits to transport ore across the M.F. Peers property, or at least a release from having to obtain permits. Grace produces evidence that VVL did not do so, or make adequate preparations to do so. Essentially, Grace's argument is that it is not "reasonably probable" that the restrictive covenant barred VVL from transporting across the property, because VVL could not have transported across M.F. Peers anyway, due to its lack of preparation. This argument does not negate the reasonable possibility that the restrictive covenant itself "materially caused" VVL's transportation damages. VVL produced evidence that it did approach the Army Corps in 1992, documents evidencing that VVL approached HGSI about its plans, expert opinions stating that its proposal might not affect the wetlands such that no permitting would be required, and evidence that a transportation system could be built so as not to require a permit.

Further, VVL's proof of causation will not fail if obtaining a permit would have been futile, such that HGSI would not have allowed VVL to transport ore across the land even if VVL had obtained a permit from the Army Corps. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120 n. 15, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (noting that if a plaintiff recognizes that applying for a license would be futile, failure to make a formal request for the license is not fatal to its

case); *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1142–1143 (4th Cir.1980) (holding that antitrust plaintiff who alleged that defendants caused it harm by depriving it of first-run films, may defeat argument that its own mismanagement caused its harm, due to its failure to bid for the films, by showing that bidding would have been futile); *see also Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir.1994) (holding, where plaintiff complained that defendant optometrists violated antitrust laws by not providing her with her medical records, it was no defense to assert that no obligation to do so arose absent a written request, because it would have been futile for plaintiff to make such a request). VVL produced evidence that it would have been futile to expend resources trying to obtain a permit, and points to the plain fact that HGSI sued VVL to prevent VVL from mining Brandy B; a jury reasonably could infer that HGSI would not be amenable to VVL's transporting Brandy B ore across HGSI's property, even if VVL had a permit to do so.

A jury reasonably could conclude that permitting might not have been required at all, or that the restrictive covenant deterred VVL from seeking the permit or the release from the permitting requirements, and it would have been futile to seek a permit. A genuine dispute of material fact existing as to whether VVL's injury was caused by its own lack of preparedness, summary judgment on this issue shall be denied.

The third question is whether there is a genuine dispute of material fact as to whether Grace voluntarily would have sold its M.F. Peers property to VVL.[31] VVL

---

**31.** VVL argues that Grace cannot argue that it would not have sold to VVL voluntarily had it not donated the property to HGSI, given the Fourth Circuit's statement that "even if Grace lawfully could have donated the lands to HGSI without the nonmining agreements, it is foreclosed from challenging causation simply on the basis that it could have

achieved the same result through lawful means." *Virginia Vermiculite*, 156 F.3d at 540 (citing *Lee Moore Oil Co. v. Union Oil Co.*, 599 F.2d 1299, 1302 (4th Cir.1979)). The question for the court is not what the defendants may argue at trial, but whether VVL has sufficient evidence to support its position. Therefore, the court need not interpret this

produced a document reflecting Grace's negotiating strategy, which suggests that the amount VVL offered to Grace for the M.F. Peers property fell within the acceptable range of what Grace was willing to accept for that property. VVL offered Grace $1.75 million for the Peers', Brandy, and Nininger properties combined. VVL also produced documents stating that Grace assessed the value of VVL not obtaining these properties at $1.5 million (less than VVL's offer), that Grace was willing to accept $2.2 million (more than VVL's offer), and that Grace valued holding the properties, *i.e.* not donating them or selling them to anyone, at $1.1 million (less than VVL's offer). VVL argues that because holding the properties unmined was economically inferior to selling to VVL, Grace voluntarily would have sold to VVL, but for the donations. Grace argues that VVL's offer was too low, that VVL improperly compared the pre-tax value of the VVL offer to the post-tax value of the HGSI donation, and that the after-tax value of VVL's offer would have earned Grace less than the after-tax value of donating the property to HGSI. These are arguments the defendants may make to the jury; it is beyond the court's power to say with certainty what might or might not have happened had the alleged conspiracy not intervened. VVL produced specific facts from which it would be possible and reasonable to draw the inference that the property would have been sold to VVL but for the allegedly wrongful conduct of the defendants. This is sufficient to create a genuine dispute of material fact on this issue.

The fourth question is whether there is a genuine dispute of material fact about whether Grace had an antitrust duty to sell the M.F. Peers property to VVL. VVL proposes that any of three doctrines created such a duty in this case: (1) a doctrine prohibiting a competitor from buying inputs only to keep them from its rivals rather than to use them itself; (2) the essential facilities doctrine; (3) the *Aspen Skiing* duty to deal doctrine. The cases VVL cites in support of the first doctrine do not refer to any "duty to deal," but simply note that buying inputs only to keep them from rivals evidences anticompetitive behavior. *See American Tobacco Co. v. United States*, 328 U.S. 781, 803–04, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (affirming convictions for violations of §§ 1 and 2). Grace would fall outside such a duty, even if it existed, because it is undisputed that Grace initially purchased its Louisa County reserves with the intent to mine them, and not to keep them from VVL.

The second, "essential facilities" doctrine, requires proof of market power and a relevant market, *see Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 494 & n. 11 (4th Cir.1986). The third, *"Aspen Skiing"* duty to deal, also requires proof of the relevant market. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), the Supreme Court simply found that a monopolist of a relevant market does not have an unqualified right to refuse to deal with smaller competitors. The underlying monopolization claim required proof of the relevant market and monopoly power. *See id.* at 596, 105 S.Ct. 2847. VVL acknowledges this: "all these duties to deal would have required a showing that Grace had monopoly power in the Virginia mining rights market it was denying." (Pls.' Opp'n at 13.) As discussed *supra*, VVL has insufficient evidence, without an antitrust economics expert, to define any particular relevant market in which Grace allegedly possessed monopoly power. Further, no reasonable jury, without the aid of economic testimony, could find that Grace possesses monopoly power based on market share data alone. Typically, other factors qualify market share inferences, such as entry conditions and the ability to control price or to exclude competition. *See, e.g., Handicomp, Inc. v. U.S. Golf Ass'n*, No. 99–5372, 2000 WL 426245, at *3

statement by the Fourth Circuit at this stage of the proceedings.

(3d Cir. Mar.22, 2000) ("A mere showing of substantial or even dominant market share alone cannot establish market power"); *Western Parcel Exp. v. United Parcel Service of Am., Inc.*, 190 F.3d 974, 977 (9th Cir.1999) (holding that evidence of high market share does not raise an inference of monopoly power if the market has low entry barriers or if the defendant is unable to control prices or exclude competitors). Even if VVL produces raw data concerning these other factors, the economic inferences necessary to establish actual monopoly power cannot be drawn in VVL's favor without the aid of antitrust economics testimony. Therefore, VVL cannot establish causation by arguing that it would have obtained the properties, and not suffered damages, because Grace had a duty to deal. Summary judgment shall be granted in favor of the defendants on this issue.

■ To summarize, VVL produced sufficient evidence to establish that the defendants' alleged unlawful conduct caused its transportation costs damages. It can show causation by showing either that the defendants intended to prevent VVL from transporting vermiculite across the M.F. Peers property, and thus, the restrictive covenant was the material cause of the injury because it barred HGSI from allowing such transportation; or that the donation prevented VVL from obtaining that property and VVL otherwise would have obtained the property by buying it from Grace.

#### (2) RISK OF DUPLICATIVE RECOVERY

The court having disposed of all of the Peers' antitrust law claims, there is no risk of duplicative recovery by multiple antitrust claimants. However, the Peers' state law claims essentially ask for the same damages, lost royalties. The defendants argue that if the Peers are awarded lost royalties, and VVL obtains the properties *via* the equitable relief it seeks and ultimately must pay the Peers royalties for mining, the Peers will recover two royal-

ties for each ton of ore mined. As the court finds that the Peers cannot sustain a claim for future lost royalties, *see* Part II.E.6 *infra*, the court does not anticipate any complexity in apportioning the remedies in this case.

#### (3) NON–SPECULATIVE TRANSPORTATION DAMAGES

The defendants challenge the future transportation costs and alternative plant move costs as being unduly speculative, because the restrictive covenant on the M.F. Peers property has been removed, and Grace maintains that there is no evidence that HGSI will not permit VVL to use the M.F. Peers property in the future. Given HGSI's decade-long opposition to VVL's mining practices, it is a question of fact for the jury to decide whether HGSI will prevent VVL from using HGSI's M.F. Peers property to transport its ore in the future. Further, VVL's future transportation costs claim does not suffer from the same infirmity as its future lost profits claim, because calculating the amount of future transportation damages depends on actual on-road hauling costs, not on the various highly speculative market assumptions discussed above.

#### (4) OTHER FACTORS

The damages alleged by a private antitrust plaintiff must be proximately caused by the alleged violation. "[T]he rule is that one who is only *incidentally* injured by a violation of the antitrust laws, the bystander who was hit but not aimed at, cannot recover against the violator." *Shapiro v. General Motors Corp.*, 472 F.Supp. 636, 643 n. 5 (D.Md.1979), *aff'd*, 636 F.2d 1214 (4th Cir.1980) (emphasis in original) (quoting *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir.1955)). As the court shall dismiss the Peers' antitrust claims, their standing no longer is in question. The defendants do not challenge VVL's relationship to the alleged antitrust violation. Therefore, this factor is satisfied.

602

The final *Associated General* requirement also is satisfied. Having found that VVL produced sufficient evidence to establish that its transportation costs damages constitute antitrust injury, and that they reasonably can be found to have been proximately caused and caused in fact by the defendants' alleged violations, the court also finds that VVL produced sufficient evidence to establish that those damages possess the necessary relationship to the forms of injury about which Congress was concerned when it created a private antitrust remedy.

In summary, VVL produced sufficient evidence to recover under the Clayton Act for the transportation costs damages it allegedly suffered by reason of the defendants' actions, but not to recover for any other type of damages. On the issue of VVL's sufficiency of proof of transportation costs damages, the defendants' summary judgment motions shall be denied. As to VVL's other damages claims, summary judgment shall be granted.

## 2. INJUNCTIVE RELIEF (§ 16)

VVL requests "all equitable relief necessary to remedy fully the injuries to Plaintiff and to competition in the markets ... resulting from Defendants' antitrust violations, including rescinding all conveyances and assignments from Grace to HGSI of all property interests and divesting Grace of mining rights...." (Pl.'s 3d Am. Compl. at 21.)

■ Clayton Act § 16 differs from § 4 in that the latter requires a showing of actual injury while the former only requires a showing of threatened injury. Section 4 requires proof of injury to "business or property," while § 16 does not. (*See* note 27 *supra*). However, the Supreme Court held that "[i]t would be anomalous ... to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112, 107 S.Ct.

484, 93 L.Ed.2d 427 (1986). Therefore, the Supreme Court held that a plaintiff seeking injunctive relief under Clayton Act § 16 must show "a threat of antitrust injury." *Id.* at 122, 107 S.Ct. 484.

Having produced sufficient evidence to establish antitrust injury under § 4 for its claimed transportation costs and future lost profits damages, (*see* Part II.B.3.(C) *supra*), the record evidence sufficiently supports a finding of § 16 antitrust injury, as to transfers of property relating to VVL's transportation costs and future lost profits claims, *i.e.*, the transfers of the A.D. Peers and M.F. Peers properties. The fact that VVL was unable to produce sufficient evidence as to the extent of its future lost profits damages does not bar its § 16 claims on such threatened injury, because § 16, unlike § 4, "gives any ... company ... the right to go into court and enjoin the doing of ... unlawful acts, instead of having to wait until the act is done and the business destroyed and then sue for damages." *Cargill*, 479 U.S. at 113 n. 8, 107 S.Ct. 484 (quoting the legislative history of § 16). "[T]he plaintiff need only show that there is a threat that he will suffer fact of injury and that such threatened fact of injury is causally related to the defendant's pending antitrust violation." *Paschall v. Kansas City Star Co.*, 605 F.2d 403, 408 (8th Cir.1979) (footnote omitted). VVL asserts that the defendants' alleged conspiratorial acts threaten to cause it future lost profits damages from 2012 to 2020, because VVL will deplete its Virginia reserves in 2012. VVL argues it would not run out of reserves if it possessed the Peers' properties, and that, but for Grace's donations of the Peers' properties, VVL otherwise would have obtained the properties, either because Grace voluntarily would have sold the property to VVL or because Grace would have been required to sell the property to VVL pursuant to an antitrust duty to deal. As the court indicated in its discussion of transportation costs damages, VVL produced sufficient evidence that Grace voluntarily

would have sold the donated properties to VVL. This is sufficient to show that the threatened loss of future profits is causally related to the defendants' actions.

If the jury finds that the defendants conspired to monopolize vermiculite production and sales in North America, and that Grace transferred the A.D. Peers and M.F. Peers properties to HGSI pursuant to that conspiracy, the court may order whatever injunctive relief it deems necessary to correct any competitive inequities it finds, based on the evidence presented at trial. As for the other transferred properties, including Nininger, VVL showed no relationship between their donation and any actual or threatened injury to VVL. In any event, VVL stated that it only seeks injunctive relief as to the A.D. Peers and M.F. Peers properties, and not as to the Nininger property. Although evidence of the other transfers may be used to support VVL's claim of concerted action and intent, no injunctive relief as to those properties shall be permitted.

## D. HGSI AFFIRMATIVE DEFENSES

### 1. HGSI EXEMPTION

HGSI moves for summary judgment on the ground that it is exempt or immune from antitrust liability because it is a charitable organization (its charitable status having been reaffirmed recently by the Internal Revenue Service) that did not engage in fundamentally commercial activity; because it acted at the behest of the United States government (in that the 1975 Secretary of the Interior and the National Park Service encouraged Grace's donations to HGSI); and because the application of the Sherman Act in this case is inconsistent with National Environmental Policy Act ("NEPA"), *see* 42 U.S.C.A. § 4321 (West 1994 & Supp.2000), and the National Historic Preservation Act ("NHPA"), *see* 16 U.S.C.A. § 470 (West 1985 & Supp.2000), which protect the Landmark and provide that all laws of the United States shall be construed "in accordance with the policies set forth in

[NEPA]." 42 U.S.C. § 4332(1) (West 1994). VVL cross-moves for summary judgment on these issues.

■ Nonprofit organizations are not exempt from the Sherman Act based on the nature of their organization. *See Virginia Vermiculite,* 156 F.3d at 540; *see also Goldfarb v. Virginia State Bar,* 421 U.S. 773, 787, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (holding that "there is a heavy presumption against implicit exemptions" to antitrust law). Congress has not granted immunity to preservation organizations whose actions may violate the Sherman Act. Therefore, the court shall grant the plaintiffs' motion for summary judgment on HGSI's Third Affirmative Defense, claiming exemption on the basis that its actions are immune from liability because it acted at the behest of the government.

■ Regardless of any exemption status, the Fourth Circuit found that HGSI is subject to liability in this case because the transactions at issue were "essentially commercial." To support this proposition, the court of appeals found: (1) "the transaction between HGSI and Grace had obvious effects on the commercial market for vermiculite: by constraining the supply of vermiculite, the transaction increased the price of the mineral," *Virginia Vermiculite,* 156 F.3d at 541; and (2) "the transaction had direct commercial benefits for HGSI itself: by receiving hundreds of acres of land, HGSI not only realized a substantial 'pecuniary gain,' but also protected the alleged commercial interests of its management and members, which might be affected by mining of the land." *Id.*(citation omitted). HGSI argues that the Fourth Circuit's findings accepted all the allegations of the complaint as true, as the case was on appeal from this court's order dismissing various claims pursuant to Federal Rule of Civil Procedure 12(b)(6), and that, discovery having concluded, the undisputed evidence reveals that the transaction was not fundamentally commercial. HGSI correctly observes

that the plaintiffs did not produce sufficient evidence that the transactions increased the price of vermiculite. (*See* note 28 *supra*.) However, the record evidence supports the second finding. Grace documents show that the value of the donated land itself, independent of the mining rights, was $721,000. "[B]y receiving hundreds of acres of land, HGSI ... realized a substantial 'pecuniary gain,'. . . ." *Id.* The evidence also is undisputed that HGSI sold some of the donated parcels for pecuniary gain. This is sufficient to show the transaction was commercial in nature.

▆▆▆ Even if the transaction was not commercial in nature, the Fourth Circuit held, "an organization that would otherwise be exempt from the antitrust laws loses its exemption by conspiring with a nonexempt party." *Id.* at 541. As discussed *supra*, VVL produced sufficient evidence that HGSI conspired with Grace in violation of § 2. Consequently, HGSI's motion for summary judgment on its exemption or immunity status on any ground, including its argument based on NEPA and NHPA, shall be denied. The plaintiffs' motion on these issues shall be granted.

### 2. FIRST AMENDMENT DEFENSE

Both VVL and HGSI move for summary judgment on HGSI's First Amendment affirmative defense. As noted above, the *Noerr–Pennington* doctrine is based on the First Amendment. *See California Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Having found that HGSI's actions with respect to VVL's Brandy B property—*i.e.* petitioning the permit board and filing the *Brandy* lawsuit—are immune from antitrust liability under the *Noerr–Pennington* doctrine, summary judgment must be granted in HGSI's favor on its First Amendment affirmative defense, but only insofar as that defense is based on *Noerr–Pennington* with respect to the allegations described in Part II.A.1.(A)(3) *supra*.

HGSI's other ground for First Amendment protection, based on rights recognized in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), is without merit. As the Fourth Circuit previously found, and as described *supra*, HGSI was financially interested in its transactions with Grace, which removes those transactions from any First Amendment protection. *See Virginia Vermiculite*, 156 F.3d at 541 n. 2. Further, the HGSI–Grace donations were the means by which HGSI claims it intended to further the preservation cause, and as such, are not protected by *the Noerr–Pennington* doctrine. *See Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 425, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (distinguishing between restraints that are the intended *consequence* of government action, which are protected, and restraints that are the *means* by which the defendants sought to obtain favorable government action, which are not protected). The court shall grant the plaintiffs' summary judgment motion as to HGSI's First Amendment defense, but only insofar as that defense is based on conduct other than HGSI's petitioning of the permit board with respect to Brandy B and its pursuit of the *Brandy* litigation.

### 3. SLAPP SUIT DEFENSE

VVL moves for summary judgment that its lawsuit is not a "strategic lawsuit against public participation" ("SLAPP" suit), as alleged by HGSI in its Fifth Affirmative Defense. The only case HGSI cites in support of such a doctrine, *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 533 (9th Cir.1991), discusses only the *Noerr–Pennington* doctrine in the context of "heightened pleading" requirements for antitrust plaintiffs who bring antitrust claims against persons who have petitioned the government. The motion to dismiss stage having past, the SLAPP suit defense appearing indistinguishable from HGSI's First Amendment *Noerr–Pennington* defense, and having found no court in

Virginia or in the Fourth Circuit that recognizes the "SLAPP" suit defense, the court shall grant the plaintiffs' motion for summary judgment on this issue.

### 4. LACHES AND UNCLEAN HANDS

■ HGSI moves for summary judgment on the bases of laches and unclean hands. VVL filed its original suit in 1995, little over one year after the 1994 A.D. Peers donation. A one-year delay is insufficient to constitute laches. HGSI's motion shall be denied on this issue.

■ HGSI's only evidence of unclean hands are lobbying efforts by VVL to have vermiculite treated as an essential mineral, and to seek delisting of the Landmark on the grounds of despoliation. As HGSI bears the burden of proof at trial on unclean hands, its evidence must demonstrate the absence of a genuine issue of fact that VVL has unclean hands, and it must be sufficient to warrant a directed verdict in HGSI's favor if not controverted at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). HGSI's evidence is insufficient to sustain that initial burden, and its motion shall be denied on this issue.

### E. STATE LAW CLAIMS

#### 1. VIRGINIA ANTITRUST ACT

■ The Virginia Antitrust Act prohibits "[e]very contract, combination or conspiracy in restraint of trade or commerce," Va.Code Ann. § 59.1–9.5 (Michie 1998), and "[e]very conspiracy combination, or attempt to monopolize, or monopolization of, trade or commerce." *Id.* § 59.1–9.6. The plaintiffs' claims under the Virginia Antitrust Act are governed by the same standard as their claims under the Sherman Antitrust Act. *See Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Va., Inc.,* 714 F.2d 351, 358 n. 13 (4th Cir.1983). For the reasons discussed in Parts II.A–B *supra,* summary

judgment shall be granted in favor of the defendants on the plaintiffs' claims under the Virginia Antitrust Act, except as to VVL's claim for conspiracy to monopolize pursuant to § 59.1–9.6.

#### 2. VIRGINIA CONSPIRACY ACT

Both sides move for summary judgment as to VVL's Virginia Conspiracy Act claim. Section 18.2–499 of the Virginia Code subjects to criminal liability any two persons who "combine, associate, agree, mutually undertake or concert together for the purpose of ... willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va.Code Ann. § 18.2–499 (Michie 1996). Civil liability may be established for such conduct pursuant to section 18.2–500 of the Virginia Code. *See id.* § 18.2–500 (Michie 1996 & Supp.1999). The Virginia Supreme Court recently held that these sections "do not require a plaintiff to prove that a conspirator's primary and overriding purpose is to injure another in his trade or business.... Rather, ... these statutes merely require proof of legal malice, that is, proof that the defendant acted intentionally, purposefully, and without lawful justification." *Advanced Marine Enters., Inc. v. PRC Inc.,* 256 Va. 106, 501 S.E.2d 148, 154–55 (1998). The statute "does not require that the *co-conspirator* act with legal malice. Rather, the statute simply requires that one party, acting with legal malice, conspire with another party to injure the plaintiff." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 108 F.3d 522, 527 (4th Cir.1997) (emphasis added). This court previously found that "without lawful justification" means that the defendants "contrived to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Carpenter v. Drechsler,* Civ. A. No. 89–0066–H, 1991 WL 332766, at \*8 (W.D.Va. May 7, 1991) (citations omitted), *aff'd mem.,* 19 F.3d 1428 (4th Cir.1994); *see*

*also Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 337 S.E.2d 744, 748 (1985) ("[A]n allegation of conspiracy ... must at least allege an unlawful act or an unlawful purpose.").

■ Both sides' motions for summary judgment shall be denied on this issue. VVL's evidence that the defendants acted in concert to drive it out of business in furtherance of a conspiracy to monopolize, discussed in Parts II.A.1 and II.B.3 *supra*, is sufficient to satisfy its burden as to its Virginia Conspiracy Act claim. The defendants' evidence that HGSI long opposed Grace's mining practices, and that HGSI's Ms. Ely was unaware that Grace harbored any motivation besides capitulating to that opposition, is sufficient to create a genuine dispute of material fact on the issue of concerted action. The defendants also produced evidence that Grace originally offered the properties to VVL, and that Grace donated the properties to HGSI in order to "get this lady [Ms. Ely] satisfied and off our backs," (Kohnken Dep. at 42), and to "avoid the future [carrying] expenses, get the maximum tax benefit possible, and get the favorable P.R. value." (Grace S.J. Mem. Ex. 12). This satisfies the defendants' burden of setting forth specific facts showing that their purpose in entering into the transactions is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e). Therefore, both sides' motions for summary judgment shall be denied on this claim.

### 3. A.D. PEERS'S RELEASE OF ALL CLAIMS

■ Grace argues that A.D. Peers released all of his claims against Grace when he bought back Parcel A. The release allegedly includes all of A.D. Peers's antitrust claims, and all of his state law claims for contractual breaches, waste, and conversion.

Under Virginia contract law, "when considering the meaning of any part of a contract, ... [courts must] construe the contract as a whole." *Lansdowne Dev.*

*Co., L.L.C. v. Xerox Realty Corp.*, 257 Va. 392, 514 S.E.2d 157, 161 (1999). *See also Santos v. Santos*, No. 2712–98–4, 2000 WL 251663, at *1 (Va.Ct.App. Mar.7, 2000) ("The applicable rules of construction require [courts] to construe all provisions of the contract together and to determine the meaning in this fashion where possible."). On December 27, 1973, A.D. Peers executed a deed conveying his property to Grace, including Parcel A (containing 36.62 acres), and Parcel B (containing 228.99 acres). A.D. Peers lived on Parcel A. That same day, A.D. Peers and Grace entered into an unrecorded agreement (the "1973 agreement"), which set forth the rights and responsibilities of the parties. For example, the 1973 agreement contained a royalties provision, whereby Grace would pay A.D. Peers one dollar per ton of vermiculite mined, or a rate no less than the rate Grace paid others in the Louisa County area, in the event that Grace decided to mine. Although Grace retained sole discretion to decide whether to mine, the 1973 agreement contained detailed provisions about when royalty payments were to be made, what statements Grace was required to give A.D. Peers, including what quantity and type of ore was removed, and what procedure A.D. Peers could follow to inspect Grace's records. Under the 1973 Agreement, A.D. Peers also retained the right to occupy the premises until Grace notified A.D. Peers of its intent to resell or to mine the property, at which time A.D. Peers could continue to occupy the premises until the date of closing of the resale, or for one year after Grace provided its notice of intent to mine. The 1973 Agreement also contained a provision stating that, for thirty days after Grace's notice of intent to resell the property, A.D. Peers would have the option of buying back Parcel A.

Grace gave A.D. Peers notice of its intention to donate the A.D. Peers properties to HGSI on December 18, 1993. Pursuant to the 1973 agreement, A.D. Peers chose to exercise his right to buy back

Parcel A. By deed dated January 25, 1973 (the "January 25 agreement"), Grace conveyed Parcel A back to A.D. Peers. The January 25 agreement described in detail the subject of that agreement: "All that certain tract or parcel of land in the Green Springs Magisterial District of Louisa County, Virginia, fronting on State Route 22, containing 36.62 acres, more or less, as identified as Parcel 'A' on plat of Hart & Bell.... Being a part of the same real estate conveyed to W.R. Grace & Co .... by deed dated December 27, 1973...." (Grace S.J. Mem. Ex. 16.) The January 25 agreement also provided:

> This conveyance is also made pursuant to the terms of a certain unrecorded agreement dated December 27, 1973, between W.R. Grace & Co. and Alfred D. Peers and Elizabeth D. Peers, his wife (the "Agreement"). Alfred D. Peers and Elizabeth D. Peers join in this Deed to acknowledge that Grantor has fulfilled its responsibilities under the Agreement and to release for themselves and their heirs ... any further interest, rights, claims, or privileges under the Agreement.

(Grace S.J. Mem. Ex. 16 at 2.) The parties signed the January 25 agreement under seal.

Six days later, Grace transferred Parcel B to HGSI by quit claim deed of gift, dated January 31, 1994 (the "January 31 agreement"). That agreement provided: "This conveyance is also made subject to the terms of a certain unrecorded agreement dated December 27, 1973, between W.R. Grace & Co. and Alfred D. Peers and Elizabeth D. Peers, his wife." (Pls.' S.J. Mem. Ex. 38 at 2.)

Grace argues that the January 25 agreement unambiguously releases "all claims" A.D. Peers had under the 1973 agreement, that the 1973 agreement applies both to Parcel A and to Parcel B, and that, therefore, A.D. Peers released all rights and claims he had against Grace for donating Parcel B, including the rights he had under the 1973 provisions requiring Grace to pay mining royalties for Parcel B. The plaintiffs respond that the release cannot be divorced from its context: when on January 25 A.D. Peers released "all claims" he had under the 1973 agreement, he only released "all claims" that related to the subject matter of the agreement in which the release was made, *i.e.* the January 25 agreement, the express subject matter of which was Parcel A. Therefore, the plaintiffs argue, A.D. Peers only released the claims he had concerning, for example, his right to buy back Parcel A and his right to royalties for the mining of Parcel A. Under the 1973 agreement, A.D. Peers had at least two rights: the right to buy back Parcel A, and the right to royalties for Parcel B. The plaintiffs argue that it would not make sense for A.D. Peers to relinquish one right in order to exercise the other, especially since the remaining and allegedly relinquished right was to obtain royalties for the mining of a parcel that constituted 86% of all the land originally transferred under the 1973 agreement. The plaintiffs argue further that the provision in the January 31 Parcel B agreement, making HGSI subject to the terms of the 1973 agreement, indicates that Grace still had responsibilities, and A.D. Peers still had rights, concerning Parcel B.

In considering the meaning of the release contained in the January 25 agreement, the court must construe that agreement "as a whole." *Lansdowne Dev.*, 514 S.E.2d at 161. Doing so, the court agrees with the plaintiffs' argument. The release contained in the January 25 agreement must be read in light of—not independent of—the subject matter of the January 25 agreement, which pertained only to Parcel A. Accordingly, the court finds that A.D. Peers did not release "all claims" against Grace pertaining to Parcel B. The defendants' motion for summary judgment shall be denied on this issue.

### 4. BREACH OF CONTRACTUAL DUTY OF GOOD FAITH

Virginia contract law recognizes a cause of action for failure to exercise con-

tractual discretion in good faith. *See Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 102–03 (1993) (holding that Grace breached its good faith duty to the owner of the Brandy properties by transferring Brandy A to HGSI); *Virginia Vermiculite*, 156 F.3d at 542 ("it is a basic principle of contract law in Virginia ... that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." (emphasis in original)). Grace had discretion whether to mine the Peers' properties under the contracts that provided for mining royalties if mining took place. The plaintiffs argue that they are entitled to summary judgment that Grace's donation of the A.D. Peers and M.F. Peers properties to an organization that has conducted a twenty-year campaign against the mining of vermiculite in Louisa County breached Grace's duty to exercise its contractual discretion in good faith.

The parties dispute whether proof of bad intent is required under the good faith doctrine. Grace argues that it must have intended to harm the Peers in order to be liable for breaching its duty of good faith, and that its intent is a disputed issue of material fact. The plaintiffs argue that intent is not required under Virginia law as expressed in the *Brandy* court's decision, and that a party can be strictly liable for breaching the good faith duty if its actions objectively violate the parties' reasonable expectations.

It is clear that the Virginia Supreme Court does not consider the question of bad faith as a strict liability question; it consistently has discussed bad faith in terms of the defendant's intent. The supreme court established the standard for assessing common law contract breach of good faith claims in *State Farm Mutual Automobile Insurance Company v. Floyd*, 235 Va. 136, 366 S.E.2d 93, 97 (1988): "[T]o ... establish[ ] 'bad faith' on the part of contracting parties who are merely under the obligation to exercise good faith in the conduct of a business relationship .... [the plaintiff] is required to show that the [defendant] acted in furtherance of its own interest, with intentional disregard of the financial interest of the [plaintiff]." *Id.* at 97; *cf. Nationwide Mut. Ins. Co. v. St. John*, 259 Va. 71, 524 S.E.2d 649, 651 (2000) (noting that "the action in *Floyd* was a common law breach of contract action"). *See also Chesapeake Builders, Inc. v. Lee*, 254 Va. 294, 492 S.E.2d 141, 144 (1997) (holding that purchaser of real property was not entitled to recover damages for the loss of his bargain as a result of the sellers' breach of contract, where the evidence showed the sellers "did not act in bad faith or intentionally misrepresent" that they owned the real estate they purported to sell); *Charles E. Brauer Co. v. NationsBank of Virginia, N.A.*, 251 Va. 28, 466 S.E.2d 382, 386 (1996) (observing that the U.C.C. duty of good faith requires a showing of dishonesty, not just arbitrary action).

To the extent the *Brandy* court did not consider Grace's intent, it is inconsistent with the principles of law enunciated by the Virginia Supreme Court; in such a case, this court declines to follow the *Brandy* court. To the extent the *Brandy* court did consider Grace's intent, its findings of fact were made following a bench trial and testimony by witnesses; in such a case, the issue would arise under the collateral estoppel doctrine, an argument the plaintiffs failed to raise. Although Grace's donation of the Peers' properties to an organization that opposes mining is strong evidence in the plaintiffs' favor on this claim, Grace produced evidence that it did not believe the M.F. Peers property contained commercially viable vermiculite, and that its intention was to preserve the Landmark, gain good will in the community, and receive a substantial tax benefit. The letters discussed *supra*, indicating HGSI's intent to mine, also support Grace on this claim. If Grace believed HGSI

would mine the properties, a reasonable jury could find that it did not breach its duty to exercise its contractual discretion in good faith by donating the properties to HGSI. The question of Grace's intent is a factual question that must be heard and resolved by the trier of fact. Therefore, the plaintiffs' motion for summary judgment on this issue shall be denied.

### 5. UNJUST ENRICHMENT

The court previously dismissed the plaintiffs' claims for unjust enrichment under Virginia law. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 965 F.Supp. 802, 829–31 (W.D.Va.1997), *overruled on other grounds*, 156 F.3d 535 (4th Cir.1998). The plaintiffs did not appeal that ruling. Accordingly, it remains the law of the case, and is binding on the plaintiffs. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C.Cir.1987) ("Under law of the case doctrine, a legal decision made at one state of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time."). The defendants' summary judgment motions shall be granted on this issue.

### 6. LOST ROYALTY DAMAGES

The Peers claim lost royalties from 1995 to 2025. The future lost royalties span a twenty-five-year time period, even longer than VVL's future lost profits claim. For the reasons discussed in Part II.C.1.(A) *supra*, these future lost royalties are so speculative that no reasonable jury could award them. Summary judgment shall be awarded in the defendants' favor on the Peers' future lost royalties claims.

 The Peers' past lost royalties (from 1995 to 2000) are based on the following causal chain. If Grace had not wrongfully donated the properties to HGSI, (1) Grace would have sold the prop-

erties to VVL, (2) VVL would have mined both A.D. Peers's and M.F. Peers's properties simultaneously with its mining of the Brandy properties, and (3) VVL would have paid the Peers a royalty rate equivalent to what it pays others in Louisa County. Grace challenges the first and second propositions. As discussed in Part II.C.1.(B)(1) *supra*, the plaintiffs produced sufficient evidence that Grace voluntarily would have sold the properties to VVL had it not donated them to HGSI. With regard to the second proposition, Grace argues that VVL's own witnesses testified that "the likely progression" would be to mine only one property at a time. (Grace S.J. Mem. at 81 n. 70.) These are genuine disputes of material fact. Therefore, the defendants' motions for summary judgment on the Peers' past lost royalties claims shall be denied.

### III.

To summarize, the plaintiffs' motion for partial summary judgment shall be granted in part, as to: (1) HGSI's Third Affirmative Defense (exemption and immunity); (2) HGSI's Fourth Affirmative Defense (First Amendment), except as to *Noerr–Pennington* issues; (3) HGSI's Fifth Affirmative Defense ("SLAPP suit"). In all other respects, the plaintiffs' motion shall be denied.

The defendants' motions shall be granted in part, as to: (1) the plaintiffs' Sherman Act § 1 claims and the corresponding claims under the Virginia Antitrust Act; (2) the plaintiffs' Sherman Act § 2 monopolization claims and the corresponding claims under the Virginia Antitrust Act; and (3) the plaintiffs' Sherman Act § 2 attempted monopolization claims and the corresponding claims under the Virginia Antitrust Act; (4) past and future lost profits under the Clayton Act; (5) Grace's not having an antitrust duty to deal with VVL; (6) HGSI's Fourth Affirmative Defense (First Amendment), but only as to *Noerr–Pennington* issues; (7) the Peers'

unjust enrichment claims; and (8) the Peers' future lost royalties claims. In all other respects, the defendants' motions shall be denied.

Genuine disputes of material fact remain as to the following issues. (1) VVL's federal and state conspiracy to monopolize claims, including disputed questions of fact concerning: (a) concerted action between the defendants; (b) the defendants' specific intent, meaning unity of purpose, or common design and understanding, that their alleged agreement result in Grace's monopolization of a part of interstate commerce by exclusion of Grace's only domestic competitor; (c) commission of overt acts by the defendants in furtherance of the alleged conspiracy; (d) antitrust injury, as to past and future transportation damages, plant move damages, and future lost profits; (e) causation in fact of past and future transportation damages and plant move damages, specifically as to (*i*) the defendants' intent in imposing the M.F. Peers restrictive covenant; (*ii*) whether VVL's lack of preparedness caused its transportation damages; (*iii*) whether seeking a permit would have been futile; (*iv*) whether Grace voluntarily would have sold to VVL but for the donations; (*v*) whether the recent release of all restrictive covenants eliminates any future injury; (f) amount of damages; (g) injunctive relief, as to (*i*) whether the defendants' acts threatened VVL with future lost profits; (*ii*) a causal connection between the defendants' acts and threatened future lost profits. (2) VVL's Virginia Conspiracy Act claim, including disputed questions of fact concerning: (a) whether the defendants mutually undertook to harm or injure VVL's business; (b) with legal malice (specifically, whether the defendants acted intentionally, purposefully, and without lawful justification). (3) The Peers' claims that Grace breached its implicit duty to exercise contractual discretion in good faith, including disputed questions of fact concerning Grace's intent, specifically as to whether Grace acted in furtherance of its own interest and intentionally disregarded the Peers' financial interests. (4) The Peers' state law claims for express breach of contract, waste, and conversion. (5) The Peers' claims for past lost royalties, specifically concerning causation: (a) whether Grace voluntarily would have sold the properties to VVL but for the transactions with HGSI; (b) whether VVL would have mined both of the Peers' properties simultaneously, during the alleged period of injury; and (c) what royalties VVL would have paid the Peers.

An appropriate Order shall this day issue.

### ORDER

Upon consideration of: (1) the plaintiffs' motion for partial summary judgment (originally filed December 22, 1999, redacted version filed May 10, 2000), the oppositions thereto, and the replies thereto; and (2) defendant W.R. Grace & Co.-Conn.'s motion for summary judgment (originally filed December 22, 1999, redacted version filed May 22, 2000), the opposition thereto, and the replies thereto; and (3) defendant The Historic Green Springs, Inc.'s ("HGSI") motion for summary judgment (originally filed December 22, 1999, redacted version filed May 25, 2000), the opposition thereto, and the replies thereto; and (4) all of the exhibits accompanying each of the parties' briefs; and (5) all parties' statements of material facts, the oppositions thereto, and the replies thereto; and having heard oral argument of counsel; and for the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

1. The plaintiffs' motion for partial summary judgment shall be GRANTED IN PART, as to: (a) HGSI's Third Affirmative Defense (exemption and immunity); (b) HGSI's Fourth Affirmative Defense (First Amendment), except as to *Noerr–*

*Pennington* issues; and (c) HGSI's Fifth Affirmative Defense ("SLAPP suit").

2. In all other respects, the plaintiffs' motion for partial summary judgment shall be DENIED.

3. The defendants' motions for summary judgment shall be GRANTED IN PART, as to: (a) the plaintiffs' Sherman Act § 1 claims and the corresponding claims under the Virginia Antitrust Act; (b) the plaintiffs' Sherman Act § 2 monopolization claims and the corresponding claims under the Virginia Antitrust Act; (c) the plaintiffs' Sherman Act § 2 attempted monopolization claims and the corresponding claims under the Virginia Antitrust Act; (d) the plaintiffs' past and future lost profits claims under the Clayton Act; (e) Grace's antitrust duty to deal with VVL; (f) HGSI's Fourth Affirmative Defense (First Amendment), but only as to *Noerr–Pennington* issues; (g) the Peers' unjust enrichment claims; and (h) the Peers' future lost royalties claims.

4. In all other respects, the defendants' motions for summary judgment shall be DENIED.